[L. A. No. 19164.   In Bank.   Dec. 14, 1945.]

H. H. HAGGE et al., Appellants, v. JOHN DREW et al., Respondents.

Buel R. Wood and Robert T. Linney for Appellants.

Samuel DeGroot and Aaron Sapiro for Respondents.

CARTER, J.—The complaint in this action contains two counts, the first seeks to quiet title to real property and the second to establish a trust in the same property. Plaintiffs were unsuccessful in establishing either count and defendants' title was quieted against them.

The complaint alleged and the court found that prior to November, 1941, plaintiff H. H. Hagge was engaged in the business of subdividing real property and building houses

thereon for sale, and that in connection with that business, he established connections with a bank in which Harold Humber and Harry Holmes were officers. The property involved in the instant case concerning which Hagge made agreements in the operation of his subdivision enterprises, is situated in Los Angeles County. Defendant John Drew first became acquainted with that property in November, 1941. The property had been formerly owned by the F. W. Newport Corporation Ltd., but was then in the custody of H. F. Metcalf, trustee in bankruptcy, for the assets of said corporation which had become bankrupt. The Security First National Bank of Los Angeles had asserted a claim against the property by reason of a trust indenture. Metcalf had been endeavoring for some time to sell the property and a Mr. Charlesworth brought it to Drew's attention. In December, 1941, Drew employed Charlesworth to purchase the property for him and the latter acted as his agent in the subsequent transactions. Charlesworth contacted plaintiff Hagge in December, 1941, as a prospective purchaser of the property from Drew, and Hagge made a proposal apparently accompanied by a deposit. However, the deposit was returned and the deal was not consummated. In a writing dated January 16, 1942, Hagge offered to buy the property from Drew. By contract of sale dated March 7, 1942, Hagge agreed to purchase the property from Drew for $174,270, payable $10,000 down and the balance to be represented by a promissory note payable in one year with interest payable quarterly. In the contract Hagge agreed to subdivide the property. The offer dated January 16, 1942, was made a part of the contract insofar as consistent with it. An escrow was to be opened in connection with the transaction. Hagge made the down payment.

Charlesworth, as agent for Drew, submitted to Metcalf, the trustee in bankruptcy, a written bid to buy the property for $87,135,—$20,000 cash and the balance represented by a promissory note to be secured by a trust deed on the property. Pursuant to a petition therefor, the bankruptcy court confirmed the sale of the property to Drew on January 29, 1942. Deeds dated in February, 1942, conveying the property to Drew from Metcalf and Security First National Bank were executed. Drew executed the note and trust deed. The deeds and trust deed were not recorded until March 13, 1942. The trust deed recites that it is contemplated that the property will

be subdivided and trustor agrees to subdivide a designated parcel thereof.

The escrow instructions were dated April 8, 1942, but were put into effect on April 17, 1942. The instructions were redrafted and reexecuted on April 20, 1942. In August, 1942, one parcel of the property was released to Hagge from the trust deed and contract of sale, and he subdivided it, erected homes thereon and sold them. The court found that no fiduciary relation existed between Drew and Hagge; that Drew had performed all of his obligations under the contract of sale; that Hagge paid Drew $46,350 on the unpaid balance payable under the contract and promissory note but failed to pay the remainder, and defaulted in other respects under the contract, and that his rights were terminated by Drew pursuant to the forfeiture clause therein.

This action does not purport to be one for damages for breach of contract. In their prayer plaintiffs ask for the cancellation of the contract of sale and that they be declared the owners of the property subject to the trust deed held by Metcalf and Security First National Bank in which Drew is the trustor. Hagge contends that the court erred in denying his motion under section 663 of the Code of Civil Procedure to vacate the judgment and enter a different one. The attack seems to be with reference to the last clause in a finding of the court reading: "It is not true that the plaintiffs requested the defendants to subdivide said Parcel No. 4, but the defendants refused and to avoid a serious loss to themselves and to prevent a default under the terms of said deed of trust, the plaintiffs subdivided said Parcel No. 4 and caused 206 lots to be released from said trust deed lien, according to the manner set out in said trust deed; it is true that the plaintiffs by virtue of their obligations with the defendants as contained in the agreement dated March 7, 1942, did subdivide said Parcel No. 4 and cause 206 lots to be released from said deed of trust and in accordance with the agreement dated March 7, 1942." ■ Plaintiffs appear to argue that because it was found that they subdivided a parcel of the property involved in accordance with the contract of sale and caused to be released to them 206 lots, the contract of sale was void for a lack of compliance with the Real Estate Brokers Act. (Stats. 1919, p. 1252, as amended by Stats. 1935, p. 366, § 20a; Deering's Gen. Laws, Supp. 1935, Act 112; now § 11010. of the

Bus. & Prof. Code.) The provision reads: "Prior to the time when subdivided lands shall be offered for sale or lease, the owner, his agent or subdivider shall notify the Real Estate Commissioner in writing of his intention to sell such offering. Such notice of intention shall contain the following information: the name and address of the owner; name and address of subdivider; legal description and area of land; a true statement of the condition of the title to the land, particularly including all encumbrances thereon, the terms and conditions on which it is intended to dispose of such land, together with copies of any contracts intended to be used and such other information as the owner, his agent, or subdivider, may desire to present." Reference is also made to the definition of a subdivision and subdivided lands reading: ". . . the words 'subdivided lands' and 'subdivision' are hereby defined as land or lands divided or proposed to be divided for the purpose of sale or lease, whether immediate or future, into five or more lots or parcels." (Stats. 1919, p. 1252, as amended Stats. 1935, p. 366, § 20j, Deering's Gen. Laws, Supp. 1935, Act 112; now Bus. & Prof. Code, § 11000.) And to the provision making the violation of the act a crime. (Stats. 1919, p. 1252, as amended Stats. 1935, p. 366, § 201, Deering's Gen. Laws, Supp. 1935, Act 112, now Bus. & Prof. Code, § 11020.)

Assuming that a violation of that statute would render a transaction void, we do not believe it has any application to the instant case. The findings state that plaintiffs did subdivide the property pursuant to the contract and had 206 lots released. That speaks of a subdividing by plaintiffs not defendants. The contract was not a sale or offer to sell subdivided lands and the finding does not so interpret it. It was a sale of land which lent itself to subdivision but the subdividing was to be done by the plaintiffs and by them offered for sale. Prior to that sale by them the notice of intention required by section 20a should be given. The sale of the land under the contract of sale was of unsubdivided parcels. Under the contract the lands were not proposed to be subdivided for sale, that is, for the sale under the contract. They were proposed to be subdivided after the contract of sale and then sold as subdivided lands by plaintiffs. We take it that the statutory provisions quoted do not apply to a contract of sale by the owner to a subdivider who is to subdivide the property and sell it to the public. Moreover, the evidence

shows that the land was treated as acreage and deeded to Hagge in that fashion. The reference to it as consisting of 206 lots was merely a form of expression describing a certain quantity of land.

Plaintiffs refer to the trust deed given by defendants to the trustee in bankruptcy for the balance of the purchase price requiring defendants to subdivide the property, and hence within the terms of the statute. But defendants did not purport to subdivide it themselves. They immediately made the contract of sale with plaintiffs under which the latter were to subdivide it. Even though they may have assumed the duty to subdivide, they did not do so.

Plaintiffs contend that the following finding lacks evidentiary support: ''It is true that the defendants were the owners in fee simple of said property as of March 7, 1942. It is not true that the defendants agreed with plaintiffs in accordance with the agreement dated March 7, 1942, that said real property was subject only to easements, restrictions, reservations and conditions of record, if any.'' In that connection they point to two paragraphs in the contract of sale reading: ''1. That First Party (defendants) agrees and covenants that he is the owner in Fee Simple of that certain Real Property situated in Los Angeles County. . . .'' And ''III. That First Party agrees to convey said Real Property subject to easements, restrictions, reservations and conditions of record, if any. . . .'' Paragraph III does not import that at the time the contract was made, March 7, 1942, defendants had a title clear of all encumbrances except easements, restrictions, reservations and conditions of record. Defendants merely agreed to convey the property when it came time to do so, subject to such restrictions of record. Elsewhere in the agreement defendants agreed to execute deeds to the property free from encumbrances, as and when plaintiffs have made requests therefor and were ready and able to pay for the property released at the rate of $275 (later reduced to $225) per lot.

In regard to the argument that defendants were not the owners in fee simple of the property on March 7, 1942, the date of the contract of sale, the facts are as follows: The sale from the trustee in bankruptcy to defendants was confirmed on January 29, 1942. The terms of the sale required defendants to pay $20,000 cash and give a note and trust deed for the balance of $67,135. Deeds from the trustee in bank-

ruptcy and Security First National Bank were dated in February, 1942. The note and trust deed were dated February 15, 1942, and executed by defendants on March 4, 1942. While those deeds and the trust deed were not recorded until March 13, 1942, six days after the date of the contract of sale, Charlesworth, Drew's agent, testified that the down payment of $20,000, less the $500 deposit previously paid, was made on March 2d or 3d, 1942. The deeds, trust deed and money were deposited in escrow. The deeds were recorded only a short time thereafter, indicating an intent to close the transaction prior to the date of the contract of sale. Under these circumstances the trial court was justified in concluding that for all practical purposes defendants were the owners of the property on the date of the contract of sale. Plaintiffs refer to testimony of Drew that he did not have possession of the deed prior to March 13th, but the matter was being handled by his agent, Charlesworth, and through the escrow. Plaintiffs also point to evidence that they paid $10,000 under the contract of sale on March 2, 1942, and that that money was used by Drew to make part of his $20,000 payment to his vendor, but that was all part of the same transaction, and we fail to see what difference it makes that Drew used the money paid by Hagge to consummate the transaction. Hagge was meeting an obligation to Drew pursuant to his offer to Drew to buy the property which culminated in the contract of sale where the obligation was set forth in detail. Drew was using his own money, not Hagge's, although it came from Hagge. Drew did not obtain that money from Hagge by fraud. As to being the owners, there is no evidence of any representation that Drew was the owner or that there were no encumbrances against the property, and the statement that he was owner in the contract of sale was made after Hagge had paid the money.

Plaintiffs cite Civil Code section 1057, *In re Chrisman*, 35 F.Supp. 282, *Holman* v. *Toten*, 54 Cal.App.2d 309 [128 P.2d 808], and *Libby* v. *Kipp*, 87 Cal.App. 538 [262 P. 68], for the proposition that the delivery of a deed in escrow does not convey title. But where all of the conditions of the escrow have been performed and the grantee is entitled to possession of the deed, it may be deemed that the title has passed. (10 Cal.Jur. 592.) In the instant case defendants had delivered to the escrow their promissory note and trust

deed and the $20,000 required. It is true the trust deed contemplated a subdivision of the property, but clearly the trustee in bankruptcy and Security First National Bank considered the transaction completed insofar as the passage of title was concerned, inasmuch as the trust deed and deeds were recorded with their consent a short time later, on March 13, 1942.

It is urged that, assuming title was in defendants at the time of the contract of sale insofar as a conveyance by the owner was concerned, yet the finding of ownership in fee simple is against the evidence for the interest of defendants in the property was subject to the trust deed they had given to the trustee in bankruptcy; that a person who holds property on which there is a trust deed outstanding is not the owner in fee simple and that plaintiffs did not know of the trust deed when the contract of sale was made and were thereby defrauded. The evidence supports the conclusion that no representations were made by defendants or their agents in regard to the existence or lack of existence of a trust deed against the property, that is, nothing was said about the matter except to the extent that the statement in the contract, that defendants were the owners in fee simple, could be considered as such. There existed no fiduciary relation between plaintiffs and defendants. They were dealing at arm's length. For all practical purposes defendants may have been considered, as found by the court, to be the owners in fee simple of the property even though the trust deed was outstanding. "Every estate of inheritance is a fee, and every such estate, when not defeasible or conditional, is a fee simple or an absolute fee." (Civ. Code, § 762.) A fee simple title is one that is inheritable and the holder has the power to transfer. (See *In re Barlow* v. *Security T. & S. Bank,* 197 Cal. 263 [240 P. 19].) While it is true that in California the title theory is adhered to with respect to trust deeds and the lien theory with regard to mortgages, yet for practical purposes the trustor is the owner of the property. (See *Bank of Italy etc. Assn.* v. *Bentley,* 217 Cal. 644 [20 P.2d 940].) In the instant case defendants were the owners of the property having unrestricted power to dispose of it and to pass title to plaintiffs. Indeed, the defendants, pursuant to the contract of sale, did transfer a portion of it to plaintiffs and the latter subdivided it, erected houses thereon and sold them.

Plaintiffs attack the second clause of the following finding as lacking evidentiary support: "It is not true that the plaintiffs obligated themselves, in good faith and without knowledge on their part of the true state of affairs, to pay the total sum of $174,270.00 for said property; It is not true that in the event the plaintiffs paid the full consideration for said property as contained in the agreement dated March 7, 1942, that they would not secure any right, title or interest in said property without the additional expenditure of large sums sufficient to subdivide said property and cause same to be released by lots from said trust deed lien (plaintiffs complaint exhibit "B") by previous subdividing and improving prior to the payment of the debt secured by said deed of trust." They assert that, under the trust deed, defendants were required not only to pay the note secured by the trust deed but also subdivide the property before it could be released from the trust deed, while under their contract they were entitled to a clear title when they had paid the balance of the purchase price represented by the note they gave defendants. It is not clear what conclusion they draw from that argument, but it would appear to be that the defendants breached their contract by reason of their inability to give them a clear title until the property was subdivided.

It should first be observed that Hagge admitted that he knew at all times that there was a trust deed on the property, and the court found that during the course of the transaction he knew of the terms of it. It was on record for him to read a few days after March 7, 1942, the date of the contract. No misrepresentations were made in regard to the existence of the trust deed or its contents. Plaintiffs point to no rule of law which imposed a duty on defendants to disclose the contents of the trust deed. Hence, the trial court was justified in concluding that there was no fraud.

On the matter of breach of contract it appears that the trust deed, after relating the usual obligations and duties, states that it is "contemplated" that the property will be subdivided prior to the "payment of the debt"; that bonds must be posted to secure the payment of expenses involved in the subdivision; that if there is no default in the trust deed, partial reconveyances shall be executed by the trustee upon the payment of the debt at the rate of $150 per lot for the acreage released; that all release payments received shall be applied on the next installment of principal of the debt

and all payments made on principal may be applied upon releases desired to be made by the trustor; that trustor will subdivide Parcel No. 4 of the property within six months after the date of the trust deed and "Should said improvements on said Parcel 4 be completed and paid for in such manner and within said time, then Beneficiary at his option may declare all obligations secured hereby immediately due and payable without notice to Trustor, his successors or assigns"; and in the event Parcel 4 is not subdivided then the trustor may not have a release of any of the property. Most of those provisions are plainly aimed at the giving of permission by the beneficiary to a release of property and the assurance that the debt will be paid and the property remain security when partial releases occur.

The contract of sale follows substantially the same pattern. The purchase price is stated to be $174,270 of which $10,000 was the down payment. The balance was represented by a promissory note payable in one year. Its payment is "secured" by the contract and the note shall "constitute a lien upon all the real property herein described until released by conveyance by payee." Defendants, vendors, consent to the subdivision of the property subject to their approval; that "as further consideration" plaintiffs agree to "*immediately*" proceed with the subdivision of the property, commencing with the same parcel referred to in the trust deed and proceeding thereafter with the balance of the property. That as "*further consideration*" and within six months, plaintiffs must subdivide and pay for all improvements on the property; that plaintiffs agree "to subdivide and improve the aforementioned property and to pay all balances due on said property within a period of twelve months . . ."; that requests for release of the property and conveyances of portions may be made and granted; that upon release of various parcels, defendants will convey the portions released to plaintiffs, upon payment of the price thereof. Moreover, the evidence supports a conclusion that in the conduct of the parties they treated the contract as calling for the subdivision of the property. Plaintiffs immediately took steps toward subdividing it, agreed to escrow terms following the provisions of the contract, obtained a release of Parcel 4, subdivided it, and erected houses thereon and sold them. Plaintiffs at no time offered to pay the balance due under the contract and obtain a deed to it. On the contrary their every activity was aimed toward the

development of the property as outlined in the contract. The only parcel (Parcel 4) to which the trust deed referred as required to be subdivided, was subdivided and sold by plaintiffs, and although there is evidence to the contrary, it could be found that they did so pursuant to their contractual obligation rather than to prevent a foreclosure under the trust deed. The conveyance of the property under the contract from defendants to plaintiffs was to be made when a release was made from the contract of property subdivided by plaintiffs, indicating that the latter were to subdivide the property before conveyance.

Plaintiffs complain of a finding reading: ''It is not true that when the said Harold Humber and Harry Holmes represented and stated to plaintiffs that the defendants were the owners in fee of said property, plaintiffs believed same and in reliance thereon executed various documents including the agreement dated March 7, 1942; it is not true that on or about April 20, 1942, or at any other time at all, any false or untrue statements were made by the defendants or either of them for the purpose of cheating or defrauding the plaintiffs or gaining for the defendants title to said property or for any other purpose or at all; it is not true that the defendants did not part with anything of value in obtaining title to the property.'' They state that Charlesworth, defendants' agent, never discussed the title with plaintiffs or mentioned the trust deed; that defendants are not charged with orally making any misrepresentations to the plaintiffs. They appear to be again discussing the reference to ownership in fee simple of the property in the contract of sale, and charging that it was fraud because of the existence of the trust deed. We have discussed that matter above and concluded that the trial court was justified in finding no actionable fraud.

Plaintiffs state that Drew made statements concerning his' title through Humber and Holmes, but there is no evidence that either of those persons were agents for defendants. The evidence, if indicating anything on the subject, points to those persons as being agents of plaintiffs. There is no showing that defendants caused any representations to be made by Humber or Holmes or were aware of any having been made by them.

In connection with the foregoing contention plaintiffs cite and rely upon *Watson* v. *Poore*, 18 Cal.2d 302 [115 P.2d 478]. Insofar as their claim of a resulting trust is based on the reasoning that defendants obtained the money from

plaintiffs by fraud and used it to acquire the property, it cannot be sustained, inasmuch as we have heretofore seen, there was no actionable fraud. The mere fact that defendants used plaintiffs' down payment on the property under the contract of sale to meet their obligations to their vendor, Metcalf, the trustee in bankruptcy, does not form a basis for a resulting trust. It was money *that plaintiffs were obligated to pay to defendants under the contract.* Hence, it was not money which was loaned to defendants by plaintiffs to acquire the property, or advanced by defendants to Metcalf as a loan to plaintiffs, and which, prior to the acquisition of the property, plaintiffs had promised to repay. The latter situation is that involved in *Watson* v. *Poore, supra,* and *Viner* v. *Untrecht,* 26 Cal.2d 261 [158 P.2d 3], that is, a resulting trust may arise although the payment of the purchase price to the transferor be made by the trustee, where a prior agreement embraced a loan of the purchase price from the trustee to the beneficiary.

Plaintiffs quote from *Crane* v. *Ferrier-Brock Development Co.,* 164 Cal. 676 [130 P. 429] (citing the case as *Watson* v. *Poore,* 160 Cal. 776 and 164 Cal. 776), where a complaint was held to state a cause of action where it alleged that the defendant vendor fraudulently represented to plaintiff vendee that it was the owner in fee of property when *it had no interest whatsoever* and that in reliance thereon plaintiff entered into a contract to buy the property from defendant. It states the rule that "Where the vendor fraudulently induces the vendee to enter into the contract of purchase by representing that he has a good title to the land, when in fact he has none, nor any interest whatever in the land, the vendee, upon discovering the falsity of the representation, may sue to rescind the contract and obtain a return of the money paid thereon." But in the case at bar defendants were not without interest and title in the property when the contract of sale of March 7, 1942, was made, as has heretofore been pointed out. Moreover, plaintiffs knew of the trust deed at all times. Likewise, the case of *Mattern* v. *Canavan,* 3 Cal.App. 493 [86 P. 618], is based on fraud.

██ Plaintiffs assert that the following finding lacks evidentiary support: "It is not true that the defendants have not parted with anything of value for said property and have wholly defaulted under said deed of trust; it is not true that the defendants have failed and refused to comply with any of the terms and conditions of said agreement dated March 7,

1942; it is not true that the defendants have failed and refused to execute any of the joint bonds with plaintiffs as provided in the deed of trust; it is not true that plaintiffs have been forced to and have at great expense secured said bonds and have posted them in accordance with the said deed of trust.'' Their attack appears to be aimed chiefly at the last two clauses in the finding. While it may be true that technically defendants did fail to execute a joint bond as required by the trust deed, it is not altogether clear that they were required to under the contract. The trust deed calls for a corporate surety bond or cash to be furnished by defendants to secure the payment for improvements and utilities placed on the property. The contract of sale provides that *plaintiffs* agree to pay for all such improvements and "will deposit for delivery through escrow to (defendants) . . . a good and sufficient bond satisfactory to the City of Los Angeles, and a Joint Bond with (defendants) . . . executed in favor of H. F. Metcalf, Trustee, and the Security First National Bank, conditioned for the performance of said agreement as above set forth, or, in lieu of said bond, a sum of cash acceptable to . . . (defendants).'' Reference is there made to a joint bond in which defendants would participate but later in the contract *plaintiffs* agree ''to deposit with said owner (defendants) cash or a corporate surety bond as above referred to in such amount and sum as shall be satisfactory and acceptable to said owner and or City of Los Angeles, Trustee, and Security First National Bank, conditioned for the installation of such improvements on the property so to be sub-divided and the payment of all costs and expenses thereof.'' Thus, in any event plaintiffs were obligated to furnish the bonds. It is true that defendants were unable to obtain a bond and that plaintiffs put up $5,000 cash in August, 1942, in lieu of one bond to the Security First National Bank. However, Drew supplied a financial statement to his agent, Charlesworth, and the latter endeavored to obtain a bond for him, and the furnishing of cash by plaintiffs in lieu of one bond was contemplated by the agreement. In any event the credits and balances were adjusted between the parties at the close of the escrow in September, 1942. We do not believe plaintiffs are justified in complaining of lack of performance by defendants. The essence of the finding of the court under discussion is that there was performance by defendants under the contract of sale.

It is suggested that there was actionable fraud arising

from an asserted concealment by defendants or nondisclosure to plaintiffs of the price the former paid for the property to the trustee in bankruptcy and their sale a short time after to plaintiffs for nearly double the price. The rule involved is stated as follows: "(1) There is no privilege of non-disclosure, by a party who . . . (b) knows that the other party is acting under a mistake as to undisclosed material facts, and the mistake if mutual would render voidable a transaction caused by relying thereon, . . . ." (Rest., Contracts, § 472.) And also "A party entering into a bargain is not bound to tell everything he knows to the other party, even if he is aware that the other is ignorant of the facts; and unilateral mistake, of itself, does not make a transaction voidable (see § 503). But if a fact known by one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows that the other does not know it, non-disclosure is not privileged and is fraudulent." (Rest., Contracts, § 472(1)(b) com. b.) (See also *Herzog* v. *Capital Co., ante,* p. 349 [164 P.2d 8]; *Rothstein* v. *Janss Investment Corp.,* 45 Cal.App.2d 64 [113 P.2d 465]; *Clauser* v. *Taylor,* 44 Cal.App.2d 453 [112 P.2d 661]; *Kretzschmar* v. *Janss Investment Co.,* 126 Cal.App. 698 [14 P.2d 1069]; Rest., Torts, §§ 550, 551; Rest., Restitution, § 8.) The facts of this case do not justify the application of that rule. There were no representations by defendants concerning the value of the property or what price they paid for it. As far as appears they were silent on the subject. No fiduciary relation existed between plaintiffs and defendants. They were dealing at arm's length. The property had been held for sale by the trustee in bankruptcy for a long period of time. Public proceedings were had in the federal court when the sale to defendants was confirmed. Hagge was informed of the proceedings by Mr. Newport, the president of the bankrupt corporation to whom the property belonged, and was asked to attend the hearing. The cases above cited have to do with nondisclosure of serious defects in the property sold, a very different situation from nondisclosure of the price paid for property, or its value, or from whom it was acquired. There is no actionable fraud under the circumstances.

It should be noted that a complete answer to the effect of the foregoing contentions on plaintiffs' rights is found in the court's findings reading: "It is true that from and after the time ~~April 20, 1942~~, plaintiffs learned of the contents of the deed

of trust and the fact that the defendants had purchased the property from H. F. Metcalf, Trustee in Bankruptcy, notwithstanding said knowledge, the plaintiffs went forward under the terms of the agreement of March 7, 1942, and affirmed and ratified said agreement of March 7, 1942, by executing the escrow instructions dated April 20, 1942; it is further true that the plaintiffs further affirmed and ratified the agreement of March 7, 1942, at the time they demanded and accepted the deed of Parcel No. 4 of said property from the defendants; it is further true that the plaintiffs affirmed and ratified the agreement of March 7, 1942, when they went ahead and built 206 homes on the 206 lots; it is further true that the plaintiffs affirmed and ratified the agreement of March 7, 1942, when they demanded of defendants an extension of the time limit and other terms of the agreement of March 7, 1942.'' No contention is raised as to the sufficiency of the evidence to support that finding.

Finally, it is suggested that the contract of sale is contrary to public policy because of the large difference between the price paid for the property by defendants and the selling price to the plaintiffs, the reasoning being that homes built on the property are financed through the Federal Housing Administration and priorities for materials are obtained from the Office of Price Administration; that the purchasers thereof will be unable to pay the loans on them because the land is priced too high; that as a result the government will be the loser; and that the transaction thus tended to defeat the purpose of the National Housing Act (12 U.S.C.A., § 1701, et seq.). In that connection the cases of *McAllister* v. *Drapeau,* 14 Cal.2d 102 [92 P.2d 911, 125 A.L.R. 800]; *Woods* v. *Kern County Mutual Bldg. & Loan Assn.,* 34 Cal.App.2d 468 [93 P.2d 837], and *Richard R. Adams Co.* v. *Pacific States Savings & Loan Co.,* 34 Cal.App.2d 723 [94 P.2d 370], are cited. Those cases hold that a secret second lien against property was invalid where taken by the holder of a first lien who had accepted bonds of the Home Owners Loan Corporation in settlement of his first lien. No such situation is presented in the instant case. No secret liens are involved. The contract of sale did not necessarily contemplate Federal Housing Administration loans, although apparently plaintiffs intended to and did operate under such an arrangement. We fail to see how the large profit made by defendants so tended to frustrate the purpose of the Federal Housing statutes as to be

against public policy. No representations were made to the Federal Housing Administration authorities, and as far as appears, nothing was concealed from them. Defendants had nothing to do with the loans obtained by plaintiffs, and at the time these loans were procured, presumably, the Federal Housing Administration made their independent appraisal unhindered and without any misapprehensions as to the value of the property. To say the contract here involved is against public policy would be to denounce all large profits made on real estate transactions. We know of no authority for such a holding.

The appeal from the order denying a new trial is dismissed. The order denying relief under sections 663 and 663a of the Code of Civil Procedure and the judgment are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.