**OCEAN SHORE RAILROAD COMPANY, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 71-2900.

United States Court of Appeals, Ninth Circuit.

Dec. 11, 1973.

Carl Hoppe (argued), Eckhoff, Hoppe, Slick, Mitchell & Anderson, Bruce H. Johnsonbaugh, San Francisco, Cal., C. John Bernt, San Rafael, Cal., for plaintiff-appellant.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, William S. Estabrook (argued), Tax Div. Dept. of Justice, Washington, D. C., James L. Browning, Jr., U. S. Atty., San Francisco, Cal., for defendant-appellee.

Before MERRILL, KOELSCH and SNEED, Circuit Judges.

## OPINION

MERRILL, Circuit Judge:

This case has to do with the Ocean Shore Railroad, a project of high promise to residents of the San Francisco Bay Area in the early years of the century. Since 1920 appellant corporation (taxpayer) has been engaged in dissolution and liquidation of assets in connection with which a dispute respecting income tax has reached us.

In 1905 a corporation was organized to construct and operate a railroad between San Francisco and Santa Cruz. It promptly ran into financial difficulties and, in 1911, taxpayer was organized to take over its operations. Taxpayer operated the railroad unprofitably until 1920 when its board of directors resolved to discontinue service and to dissolve and liquidate the corporation. Track and rolling stock were sold by the end of 1921, leaving taxpayer with its right of way and other assorted parcels of real property.

A series of events then occurred difficult both to reconstruct and to comprehend. One seems to be witnessing a form of the old shell game with the railroad right of way serving as the subject of the prestidigitation.

In 1929 taxpayer granted to Selah Chamberlain, representing a group of associates, an option to purchase the right of way for $100,000. Chamberlain assigned the option 'to his associate George Middleton, who in 1933 formally exercised it, and on February 20, 1934, signed a contract with taxpayer to purchase the property by paying the $100,000 in installments over a period of four years.[1] Middleton, having performed this function, then assigned the contract to Chamberlain.

An escrow was established pursuant to the terms of the agreement, and a deed to Chamberlain was executed by taxpayer and deposited in escrow. By February, 1938, the full purchase price had been paid into escrow, the sale had been consummated and Chamberlain and his associates were entitled to delivery of the deed.

In the interim, however, certain events had occurred.

In its income tax returns for 1934 to 1938 taxpayer reported a cost basis for the right of way of $1,657,717.19, and a sale price of $100,000 received by installments, with a resulting loss of $1,557,717.19.

On November 23, 1934, a Nevada corporation, Ocean Shore Railroad, Inc., was organized. On November 27, 1934, taxpayer transferred its right of way to the new corporation for 250 shares of the latter's stock, this being all of the Nevada corporation's capital stock.

On June 24, 1935, the State of California instituted condemnation proceedings against the new corporation as owner of the right-of-way property.

In August, 1935, Chamberlain died.

On June 25, 1936, the Nevada corporation deeded the right-of-way property back to taxpayer, and taxpayer returned the 250 shares of stock.

On March 15, 1937, taxpayer wrote its shareholders[2] advising:

"The Group which has purchased the right of way of this company in San Mateo County desires to take over all of the outstanding stock of the company, a part of which you now hold.

Your Directors have studied this matter carefully and see no reason why all of the outstanding stock of the company should not be turned over to them, as by so doing it would save you the expense of legally dissolving the corporation upon completion of liquidation.

The stock would not be delivered to this group until they have paid in full the agreed price, and there now remains but one more payment for them to make, upon which they will be deeded the entire right of way of your company."

Over 90 per cent. of the shareholders sent in their stock to the escrow, with instructions that it was not to be delivered until the full purchase price had been paid and any remaining assets had been transferred by taxpayer to trustees for the shareholders.

So things stood in 1938, when the full purchase price agreed upon was paid into escrow. Chamberlain's associates were then entitled to delivery of both the deed and the surrendered shares of stock. Instead the deed was returned to taxpayer, the escrow holder noting in the file that the escrow was closed "by reason of the death of the grantee and the failure of the deal." The shares of stock have remained in escrow ever since.

---

1. It seems apparent that condemnation of a portion of the property by the State of California for highway use was in prospect. Chamberlain agreed to defend any condemnation proceedings that might be commenced, and taxpayer assigned to Chamberlain any cause of action it might have for damages caused by trespass of "Joint Highway District No. 9."

2. Although this letter bears the date March 15, 1937, the form letter enclosed, which was to accompany the certificates back to escrow, was dated "Feb. —, 1934," and recited, "It is our understanding that you have this day entered into an agreement to purchase," etc.

In December, 1942, taxpayer was added as a defendant in the condemnation suit, and in September, 1961, it received a settlement from the state in the sum of $1,778,380 for 119.146 acres of right-of-way property. In its income tax return for 1961 taxpayer reported a cost basis for the property of $1,778,156.31, resulting in no gain or loss.

The Internal Revenue Service rejected this report. Instead it determined that taxpayer had taken over the purchasers' cost basis. It recognized that certain additional sums had been expended by the purchasers over the years on improvements to the property, bringing the basis for the whole of the property up to $673,742.21. It allocated this basis among the various parcels and determined that the basis of the condemned property was $339,984.31, and that with certain selling expenses taxpayer had realized a capital gain of $1,408,118.60. Taxpayer paid the resulting deficiency and sued for refund. The District Court upheld the Service, and taxpayer has taken this appeal.

The question presented is whether taxpayer is entitled to claim its own original cost basis, or must take the basis of the purchasing group. We agree with the District Court that the latter is the correct answer.

Taxpayer contends that the parties abandoned the right-of-way sale and that the sale became one of corporate stock, leaving title and ownership of the real property in the taxpayer. We cannot agree that the legal and tax consequences of what occurred was abandonment of the sale of the property.

By their option and purchase agreement, the purchasing group made it plain that it was the right of way property that they were after, and not the corporation. That agreement never was rescinded or repudiated. Under California law, there was a completed sale of the land to the Chamberlain group. Legal title to the land passed when all the conditions of the escrow were met; physical delivery of the deed was not necessary. Hagge v. Drew, 27 Cal.2d 368, 165 P.2d 461, 465 (1945); Todd v. Vestermark, 145 Cal.App.2d 374, 302 P.2d 347, 349 (Dist.Ct.App.1956); Holman v. Toten, 54 Cal.App.2d 309, 313–314, 128 P.2d 808, 810–811 (Dist.Ct. App.1942). When the purchase price was fully paid, then, the sale was a completed transaction with the rights of the purchasers to the property fully established and with their tax basis fixed as the purchase price. When the purchasers took steps which had the effect of relinquishing their interest in the right of way back to the corporation which they then controlled—by declining to take and record the deed, and instead acquiescing in Ocean Shore's continuing to act as owner—this amounted to a nontaxable contribution to taxpayer's capital. See 26 U.S.C. § 118. Retaking the property in this manner, taxpayer assumed its contributors' basis. See 26 U.S.C. § 1015. Only to this extent have the purchasers made an investment in the right of way.

The escrowed shares of stock do not alter the situation. Contrary to taxpayer's contentions, it does not appear that there ever was any suggestion on either side that the nature of the sale transaction was to be changed—that money was being paid for something different, and that an entirely different agreement was in effect. The payment of the purchase price was never conditioned on the deposit of stock. It remained conditioned on the deposit of a deed. Although certificates for over 90 per cent. of the stock were eventually sent in to escrow, the balance of over 8 per cent. has never made its appearance and some original shareholders apparently still retain their interest. The letters of instruction accompanying the surrendered certificates made it plain that it was compliance with the terms of the agreement of February 20, 1934, that was the condition for delivery of the certificates to the purchasers. Delivery of the stock was to await such time as the corporation was wholly without assets, so that what would be transferred was the corporate shell.

This is not to say that the substance of an executory contract of sale can never be changed in mid-stream with different tax consequences attaching upon its completion. It is simply to say that this did not occur here. Amid all the mysterious maneuvering that did take place, formalities essential to such a change or recasting were wholly lacking.

Judgment affirmed.