[L. A. No. 22540. In Bank. Mar. 1, 1954.]

MERINOETH R. OSBORN, Appellant, v. LOUISE L. OSBORN, Respondent.

Guerin & Guerin and John J. Guerin for Appellant.

Louis Warren for Respondent.

TRAYNOR, J.—Plaintiff Merinoeth Osborn appeals from an adverse judgment on his complaint to quiet title to certain real property in Los Angeles County, known as Lot 97 of the Casa Verduga Villa Tract. Defendant Louise Osborn, plaintiff's stepmother, answered and cross-complained to have title to Lot 97 quieted in her. Judgment was entered for plaintiff on the cross-complaint, and defendant Louise Osborn has not appealed therefrom. The other defendants named in the complaint disclaim any interest in the property.

Lot 97 was originally acquired by Merinoeth's mother, Chloie Osborn, in 1922. Chloie died intestate leaving her husband, Thomas D. Osborn, and their son, Merinoeth, surviving. On June 27, 1939, during the administration of Chloie's estate, Merinoeth and Thomas executed a "Stipulation," subsequently approved by the court, to resolve their conflicting claims to Chloie's estate. The material part of this stipulation follows: "It is further stipulated and agreed by and between the parties hereto that upon execution of the within Stipulation that Thomas D. Osborn will execute either by deed contract or declaration of trust sufficient documents, conveyances or declarations so that the property known as Lot 97, Casa Verduga Villa Tract, etc., will be retained in

the name of Thomas D. Osborn, during his lifetime and that the same should vest in his son Merinoeth R. Osborn at the time of the demise of the said Thomas D. Osborn.'' After the execution of the stipulation, the probate court distributed Lot 97 to Thomas.

On July 7, 1939, pursuant to the stipulation, Thomas and Merinoeth executed a trust agreement, and Thomas executed a deed ''in accordance with the terms and conditions of that certain trust agreement of July 7th, 1939, . . . and . . . *subject to all conditions, exceptions and reservations as in said trust agreement provided.*'' (Italics added.) The deed granted Lot 97 to Merinoeth subject to a life estate in Thomas. The trust agreement provided that the deed to Lot 97 ''shall be turned over and delivered to the Trustees to hold and keep possession of said deed, not to record the same during the lifetime of'' Thomas. The trustees were instructed to ''turn over and deliver'' the deed to Merinoeth on the death of Thomas. It was recited in the trust agreement that Thomas reserved a life estate in the property, and that he also reserved *''the right to revoke the deed in the event [Merinoeth] wilfully harms [Thomas]*, and [Merinoeth] reserves the right to cancel this agreement if [Thomas] wilfully harms'' him. (Italics added.) Other material parts of the trust agreement are: ''The parties hereto further agree that *in the event any attempt is made by either party* hereto to break the terms of the within trust agreement, or *to force the trustees to surrender the within described deed prior to the demise of [Thomas]* by court action, or other proceedings, then, in that event, the party attempting to break the terms of the within trust agreement, shall pay in addition to expenses and court costs, a reasonable attorney's fee to the said trustees. The parties hereto further *authorize and instruct the trustees herein mentioned to defend any attempts made by either parties hereto to break the terms of the within trust agreement, or to force the trustees to surrender the within described deed.* . . . The wilfull failure or refusal on the party [sic] of either party hereto to carry out the terms and conditions of the within trust agreement, or the wilfull refusal or failure of either party to comply with the obligations herein provided, on his part to be performed, shall permit either party to rescind this agreement and shall confer upon the grantor the right to cancel the within mentioned deed and this agreement by a declaration duly executed and recorded with the formality of a deed and a thirty day writ-

ten notice thereof served on the grantee, or his attorney.'' (Italics added.) The deed was deposited with defendants Franklin and Warner, who were named as trustees in the trust agreement.

Merinoeth had become indebted to Warner for legal services in the probate of Chloie's estate and the preparation of the trust agreement. In 1941, Warner resigned as trustee and assigned his claim against Merinoeth to his secretary, Champion, who recovered judgment thereon. Execution was levied on Merinoeth's interest in Lot 97, and the property was sold in 1942 to Champion for $336.37. Thereafter, at the request of Thomas, Champion transferred the certificate of sale to Louise Osborn for $415. Although Louise contends that Merinoeth had notice of these proceedings, he made no appearance and disclaims any knowledge of them.

In anticipation of a sale of Merinoeth's interest in Lot 97 to Thomas, an agreement purporting to cancel the trust agreement was executed on January 14, 1946 and then cancelled in March 1946. Thomas died intestate on December 31, 1946, leaving his second wife, Louise, and Merinoeth surviving. Merinoeth's subsequent demand upon the trustees for the deed executed by Thomas was refused.

In refusing to quiet title in either Merinoeth or Louise, the trial court concluded that Merinoeth had not acquired any interest in Lot 97 under the deed executed by Thomas and deposited with Warner and Franklin. Since Merinoeth had acquired no interest, the court concluded that Louise acquired none by reason of the execution sale.

Plaintiff's basic contention on this appeal is that the trial court erred in holding that he acquired no interest in Lot 97 under the deed executed by Thomas and deposited with Warner and Franklin to be transmitted to him on the death of Thomas. Plaintiff contends that the deposit with Warner and Franklin constituted a valid delivery immediately vesting in him a remainder interest in the property. The first issue to be resolved, therefore, is the validity and effect of the deed executed by Thomas.

It has long been established in this state that the deposit of a deed granting an estate in fee simple, with instructions that it be transmitted to the grantee upon the death of the grantor, conveys a remainder interest in fee simple with a life estate reserved in the grantor, if the grantor intended the deposit to be irrevocable. (*Bury* v. *Young*, 98 Cal. 446, 451-452 [33 P. 338, 35 Am.St.Rep. 186]; *Hunt* v. *Wicht*,

174 Cal. 205, 206-208 [162 P. 639, L.R.A. 1917C 961]; *Wilkerson v Seib*, 20 Cal.2d 556, 560 [127 P.2d 904].) The result is the same as if the grantor delivered to the grantee a deed reserving a life estate and granting a remainder in fee.

The same result is also accomplished by the deposit of a deed in escrow pursuant to a binding contract of sale of a remainder and the grantee's performance of the conditions of the escrow. At the time of the execution of the contract of sale, the grantee acquires an equitable title to the estate being sold; the grantor retains the legal title as security for the purchase price. The legal title passes to the grantee at the time of his completion of the conditions precedent, whether or not the escrow holder gives him physical possession of the deed; the grantor's delivery to the escrow holder is absolute and cannot thereafter be disaffirmed. (*Cannon v. Handley*, 72 Cal. 133, 140 [13 P. 315]; *McDonald v. Huff*, 77 Cal. 279, 282 [19 P. 499]; *Bradbury v. Davenport*, 120 Cal. 152, 154 [52 P. 301]; see, also, *Hagge v. Drew*, 27 Cal.2d 368, 375 [165 P.2d 461].)

In the present case, the deed from Thomas to Merinoeth was executed pursuant to a binding contract supported by adequate consideration. On the face of the deed, Thomas reserved a life estate and granted a remainder to Merinoeth. When Thomas delivered the deed to the trustees, there were no conditions precedent for Merinoeth to perform. Thomas had received the consideration for the grant, when the compromise settlement of Chloie's estate was executed. The provision that the trustees should hold the deed until Thomas' death was not a condition precedent to the passage of legal title, for even in cases of gift, e.g., *Bury v. Young, supra,* an instruction that the depositary is to retain possession of the deed until the death of the grantor does not prevent the deed from being operative as a present conveyance. In this case, Merinoeth was not a donee; he was a purchaser for value, already vested with an equitable title to the remainder. The situation is thus analogous to that of a true escrow after the purchaser has performed all of the conditions precedent. Performance of those conditions automatically vests the legal title in him, even though the escrow holder retains possession of the deed.

Defendant contends, however, that Thomas did not make a legal delivery of the deed. Delivery is a question of intent. In some cases to ascertain the grantor's intent it is necessary to have recourse to his acts and declarations

364

both before and after his transmission of the deed to the grantee or a third party (*Williams* v. *Kidd*, 170 Cal. 631, 649-652 [151 P. 1, Ann.Cas. 1916E 703]; *Rice* v. *Carey*, 170 Cal. 748, 753-754 [151 P. 135]; *Donahue* v. *Sweeney*, 171 Cal. 388, 391-392 [153 P. 708]; *Northern Calif. Conference Assn.* v. *Smith*, 209 Cal. 26, 33 [285 P. 314]). When, as here, however, the grantor's ''only instructions are in writing, the effect of the transaction depends upon the true construction of the writing. It is in other words a pure question of law whether there was an absolute delivery or not.'' (*Moore* v. *Trott*, 156 Cal. 353, 357 [104 P. 578, 134 Am.St.Rep. 131].)

■ Thomas executed the deed and delivered it to the trustees pursuant to the provisions of the trust agreement. It was a completed act and nothing remained to be done to vest the legal title to the remainder in Merinoeth. Thomas was bound by the terms of the trust agreement, executed contemporaneously with the deed, not to attempt to recall the deed from the possession of the trustees. The trustees were specifically instructed to resist any attempt by either Thomas or Merinoeth to obtain possession of the deed prior to the demise of Thomas, and were further instructed to hold the deed for the benefit of Merinoeth. Even if it had been contended that Merinoeth had harmed Thomas or failed to carry out the terms of the trust agreement and Thomas had wished to assert his right to revoke, he. could not recall the deed; he had to execute and record a declaration of revocation with the formality of a deed, after giving 30 days' notice thereof to Merinoeth, who might then defeat the proposed revocation by showing that there was no violation of the trust agreement.

■ It is clear, therefore, that Thomas did not retain control over the deed after he delivered it to the trustees. There is nothing in the trust agreement, or external to it, to indicate that Thomas did not intend the transmission of the deed to the trustees to be a valid legal delivery. Indeed, the whole tenor of the stipulation and the trust agreement is that Thomas intended to grant Merinoeth a presently vested remainder interest. In the stipulation of June 27th, Thomas promised that ''upon execution of the within Stipulation'' he would execute the documents necessary to transfer a remainder interest to Merinoeth. The trust agreement contained a number of restrictions on Thomas' right to use the property during his lifetime. If Merinoeth was not to have a presently vested remainder interest, these provisions were superfluous. ■ Furthermore, Thomas' conduct after the execution and delivery

of the deed, in requesting Champion to sell the certificate from the execution sale and in negotiating with Merinoeth in 1946 (after the execution sale) for the purchase of his interest in the property for $3,500, is corroborative of Thomas' intent as revealed in the documents.

Defendant contends, however, that Thomas' reservation of the right to revoke the deed, in the event that Merinoeth harmed him or refused to carry out the terms of the trust agreement, made the delivery to the trustees conditional so that no estate vested in Merinoeth by virtue of the deposit of the deed with the trustees. This contention cannot be sustained. ▇ Thomas' right to revoke did not affect the delivery to the trustees, but merely limited the future interest created to a vested remainder subject to being divested upon the happening of a condition subsequent. The situation is similar to that in *Tennant* v. *John Tennant Memorial Home,* 167 Cal. 570 [140 P. 242], where the grantor reserved an unqualified right to revoke on the face of the deed, which granted a remainder in fee to vest in possession at the termination of the grantor's life estate. It was there held that the grantee acquired a remainder subject to a condition subsequent, and that "The power to revoke did not operate to destroy, or in anywise to restrict the effect of the deed as a present conveyance of a future vested interest." (167 Cal. 570, 578; see, also, *Gray* v. *Union Trust Co.,* 171 Cal. 637, 642-643 [154 P. 306]; Scott, The Law of Trusts, 1939, vol. 1, § 57.1.) These cases are distinguishable from those on which defendant relies to sustain her contention that the grantor's reservation of a right to revoke renders the delivery conditional. (See *Kenney* v. *Parks,* 125 Cal. 146, 150-151 [57 P. 772]; *Moore* v. *Trott,* 156 Cal. 353, 357 [104 P. 578, 134 Am.St.Rep. 131]; *Long* v. *Ryan,* 166 Cal. 442, 445 [137 P. 29].) The latter cases were cases of gift, and the court was concerned with the problem of attempted testamentary disposition without compliance with the statute of wills. In those cases, the grantors reserved the right to recall their deeds from the depositary. It was found that the respective grantors did not intend any interest to pass to the grantees when the deeds were given to the depositary, but only intended an interest to pass at the time of their death. The right to revoke was, therefore, a right to recall the deed, and attached to the delivery and not to the interest granted. ▇ In the present case, the deed was executed and delivered to the trustees, not to accomplish any testamentary purpose, but to discharge Thomas' obligations

under the contract he entered into with Merinoeth to compromise their conflicting claims to Chloie's estate. This contract vested Merinoeth with an equitable title to the remainder, since he had a specifically enforceable right to have Thomas convey the legal title. The legal title was conveyed when the deed was delivered to the trustees under a binding contract that made the delivery irrevocable. (*Cannon* v. *Handley, supra*; *McDonald* v. *Huff, supra*; *Pothast* v. *Kind,* 218 Cal. 192, 195 [24 P.2d 771] ; see, also, *Brunoni* v. *Brunoni,* 93 Cal.App.2d 215, 219 [208 P.2d 1028].) Although Thomas could have accomplished the same result by delivering a deed to Merinoeth with the same reservations as those set forth in the trust agreement (see *Tennant* v. *John Tennant Memorial Home, supra*) —just as in the cases like *Bury* v. *Young, supra,* the same result could be accomplished by delivery to the grantee of a deed granting a remainder interest—the effect of the transaction is the same: Merinoeth acquired a vested remainder subject to divestment should he breach the terms of the trust agreement.

The only question remaining is the order that should now be made by this court. Merinoeth contends that the part of the judgment refusing to quiet title in him should be reversed with directions to enter a judgment quieting his title to the property and that the part of the judgment refusing to quiet title in Louise should be affirmed because she did not appeal. This contention cannot be sustained.

The trial court determined that Merinoeth did not obtain an interest under the deed and therefore refused to quiet title either in him or in Louise. If Merinoeth did not acquire a remainder interest, Louise could acquire nothing by the execution sale. Apparently in the belief that as a result of the judgment each party would get half the property as an heir of Thomas, Louise did not appeal. Merinoeth appealed, contending that he acquired a remainder interest under the deed, that the execution sale did not pass any interest to Louise, and that he was therefore entitled to the property. Had Louise appealed, her position could only be that Merinoeth acquired a remainder interest and that the execution sale was effective. That contention, however, would concede the first half of Merinoeth's proof—that he acquired a remainder interest— a concession fatal to a claim that she was entitled to half the property as an heir of Thomas. She was apparently willing to let the judgment stand and take half an interest as heir rather than risk an adverse ruling with respect to the execu-

tion sale, which would leave her with nothing. ▉ "[T]he failure to take an appeal demonstrates only satisfaction with the judgment *as is*, not as changed by a partial reversal. One may elect to stand upon a judgment which, he believes, although largely in his favor, does not give him all of the benefits to which he is entitled. To avoid the time and expense of further litigation, he may be persuaded to permit the unfavorable portions to stand in reliance upon the benefits received in the other parts." (*American Enterprise, Inc.* v. *Van Winkle*, 39 Cal.2d 210, 221 [246 P.2d 935].)

▉ Both parts of the judgment turned on the trial court's construction of the deed and agreement. It refused to quiet title in Merinoeth on the ground that he did not acquire an interest by the deed and agreement; it refused to quiet title in Louise for the same reason. Since both parts of the judgment embrace the identical issue—did Merinoeth acquire a remainder interest under the deed—we have jurisdiction to review the entire judgment. (*American Enterprise, Inc.* v. *Van Winkle, supra,* 39 Cal.2d 210, 217; *Blache* v. *Blache,* 37 Cal.2d 531, 538 [233 P.2d 547]; *Milo* v. *Prior,* 210 Cal. 569, 571 [292 P. 647]; *Whalen* v. *Smith,* 163 Cal. 360, 362 [125 P. 904, Ann.Cas. 1913E 1319].) Our decision that a remainder interest passed under the deed removes the basis of the trial court's decision adverse to Louise and unless the entire judgment is reversed she will be denied an opportunity to establish her claim that the execution sale was valid. A complete reversal is therefore appropriate. (*Blache* v. *Blache, supra*; *Rediker* v. *Rediker,* 35 Cal.2d 796, 798 [221 P.2d 1, 20 A.L.R.2d 1152]; *Estate of Murphey,* 7 Cal.2d 712, 717 [62 P.2d 374]; *cf. Hamasaki* v. *Flotho,* 39 Cal.2d 602, 609 [248 P.2d 910].)

The judgment is reversed. The parties are to bear their own costs on appeal.

Gibson, C. J., Shenk, J., Edmonds, J., and Spence, J., concurred.

CARTER, J., Concurring and Dissenting.—I concur in the reversal of that portion of the judgment from which plaintiff appealed, which reads as follows: "That plaintiff take nothing by reason of his amended complaint herein and that defendant Louise L. Osborn have judgment for costs of court expended in the sum of $_____," but I dissent from the holding of the majority that the judgment against defendant

and cross-complainant from which no appeal was taken must also be reversed. That portion of the judgment reads as follows: "That cross-complainant take nothing by reason of her cross-complaint herein, and that cross-defendant Merinoeth R. Osborn have judgment for costs of court expended in the sum of $_____."

It is obvious from a reading of the majority opinion that the two portions of the judgment above quoted are separate and distinct and that they are in nowise interdependent, or that the portion from which plaintiff and cross-defendant has appealed is so connected with the remainder, from which no appeal was taken, that the appeal from the first part affects the second part and involves a consideration of the whole judgment. This conclusion is manifest from the face of the majority opinion itself where it discusses in detail both the facts and the law relating to plaintiff's side of the case but only gives a passing reference to the basis upon which defendant and cross-complainant claims title to the property. The majority opinion does not purport to hold that there would have been merit in an appeal prosecuted by defendant and cross-complainant if such an appeal had been taken. Notwithstanding this situation, the majority directs the reversal of the entire judgment so that the claims of the defendant and cross-complainant set up in her cross-complaint may again be litigated in the trial court.

In so holding the majority goes outside of the record in suggesting possible reasons why defendant and cross-complainant did not appeal, as if her reasons for not appealing had any bearing whatever upon the scope of review of this court on an appeal by plaintiff from the portion of the judgment against him. Until the decision of this court in *Hamasaki* v. *Flotho*, 39 Cal.2d 602 [248 P.2d 910], it was the settled rule that "when an appeal is taken from a part of a judgment or order not so intimately connected with the remainder that a reversal of the part appealed from would require a reconsideration of the whole case in the court below, an appellate court can review only the portion appealed from. The unaffected parts must be deemed final, and can be enforced pending the appeal." (See 4 Cal.Jur.2d, § 535, p. 389.) This rule has been followed in every case decided by this court prior to the Hamasaki case, *supra*, and it has never been departed from except in the Hamasaki case. In *Glassco* v. *El Sereno Country Club, Inc.*, 217 Cal. 90 [17 P.2d 703], the late Chief Justice Waste, speaking for a unanimous

court, said (p. 91): "Preliminarily, it might be said that that portion of the judgment denying the appellants a lien, and which is attacked by the plaintiffs in their brief herein, is not properly a subject of review upon this appeal because of the insufficiency of the notice of appeal. The notice states that the appeal is 'from so much of the judgment herein as denies relief to the plaintiffs against the said defendant, Clotilde G. Castruccio . . .' The notice of appeal makes no mention of that separate and distinct portion of the judgment denying plaintiffs a lien. It is elementary that an appeal from a portion. of a judgment brings up for review only that portion designated in the notice of appeal. (2 Cal.Jur. 155, sec. 25.) While it is true that notices of appeal are to be liberally construed with a view to hearing causes on their merits (*Harrelson* v. *Miller & Lux,* 182 Cal. 408, 414 [188 Pac. 800]), we are of the opinion that the notice filed in the present case does not present 'a mere misdescription' of the judgment, calling for the application of said rule, but rather presents a situation somewhat analogous to that presented in *Dimity* v. *Dixon,* 74 Cal.App. 714, 718 [241 Pac. 905], viz., one where the description of that portion of the judgment appealed from is so clear and unmistakable as to preclude a description of that portion of the judgment denying appellants a lien." The following cases fully support the rule that an appellate court has jurisdiction to review the portion of the judgment appealed from only unless the part appealed from is so interwoven and connected with the remainder, or so dependent thereon, that the appeal from a part affects the other parts or involves a consideration of the whole, and is really an appeal from the whole judgment: *Lake* v. *Superior Court,* 187 Cal. 116 [200 P. 1041]; *G. Ganahl Lbr. Co.* v. *Weinsveig,* 168 Cal. 664 [143 P. 1025]; *Whalen* v. *Smith,* 163 Cal. 360 [125 P. 904, Ann.Cas. 1913E 1319]; *In re Burdick,* 112 Cal. 387 [44 P. 734]; *Luck* v. *Luck,* 83 Cal. 574 [23 P. 1035]; *Early* v. *Mannix,* 15 Cal. 149; *Pacific Mutual L. I. Co.* v. *Fisher,* 106 Cal. 224 [39 P. 758].

It must be remembered that the judgment denying plaintiff relief was based upon his complaint and the evidence offered by him in support of the allegations of the complaint that he was the owner of the property as a result of the deed executed by his father and placed in escrow to be delivered to plaintiff upon his father's death. The judgment denying defendant relief was based upon the allegations of her cross-complaint that she was the owner of the property as the

result of an execution sale under a judgment against plaintiff. It seems to me that if this court has the power to review the portion of the judgment against the defendant, it should determine on this appeal the validity of the execution sale and the conveyances under which defendant claims and then reverse the entire judgment with directions to render judgment either in favor of plaintiff or defendant, thus bringing an end to the litigation. However, the majority does not purport to do this but nevertheless reverses the judgment against the defendant who did not appeal therefrom and makes no contention that the judgment against her was erroneous.

Section 938 of the Code of Civil Procedure provides: "Any person *aggrieved* may appeal in the cases prescribed in this title. The party appealing is known as the appellant, and the adverse party as the respondent." (Emphasis added.) It goes without saying that plaintiff could not have appealed from the portion of the judgment against the defendant, since he was not aggrieved thereby, and defendant could not have appealed from the portion of the judgment against plaintiff for the same reason. Therefore, plaintiff appealed from the only portion of the judgment from which he could lawfully appeal.

Section 956 of the Code of Civil Procedure which covers the matters which may be reviewed on appeal from a judgment concludes with the following sentence: "The provisions of this section do not authorize the court to review any decision or order from which an appeal might have been taken." The clear implication of this provision is that the court may not review any decisions or order from which an appeal might have been but was not taken. Applying this provision to the case at bar it seems clear that this court is not authorized to review the judgment against defendant from which no appeal was taken.

To summarize, it appears that the plaintiff appealed from the portion of the judgment denying the relief demanded by him in his complaint. The majority opinion holds that his appeal is meritorious. The relief demanded by defendant was by way of cross-complaint and the judgment denied her such relief. She did not appeal. It is conceded that her claim of title is based upon instruments entirely separate and apart from the instruments on which plaintiff's claim of title is based. Defendant has not sought to have this court review the portion of the judgment denying her relief on her

cross-complaint. It is obvious that the portion of the judgment denying her relief on her cross-complaint is in nowise related to the portion of the judgment denying plaintiff the relief demanded in his complaint. There is no interdependence between the two portions of the judgment. Such being the case, it is clear under both the code provisions relating to review on appeal and the authorities which I have cited above that the review here should be limited to the portion of the judgment from which plaintiff appealed, and that the judgment against defendant from which no appeal was taken should not be reviewed.

As stated earlier in this opinion the only case holding to the contrary is *Hamasaki* v. *Flotho, supra.* The decision in that case was based upon the theory advanced by the majority that even though there was no appeal from the judgment and only an appeal from an order granting a limited new trial, this court had the power to review the judgment because it felt required to do so "in the interests of justice." There was no question of any interdependence in the Hamasaki case as there was only one judgment and one order, both of which were in favor of the respondent. The majority now rely upon the Hamasaki case as authority for reversing the judgment against defendant in the case at bar from which no appeal has been taken. Certainly the Hamasaki case is not authority for the holding in this case. The other cases relied upon by the majority clearly fall within the exception to the rule that where the part of the judgment appealed from is so interwoven and connected with the remainder, or so dependent thereon, that the appeal from a part affects the other parts or involves a consideration of the whole, that it is really an appeal from the whole judgment. The case at bar does not fall within this rule as clearly appears from what I have heretofore stated.

It should be noted that the foregoing rule relates only to judgments which are not divisible into *separate* parts. And in order for the rule to be applicable, the judgment, *on its face,* must disclose that the part appealed from is interwoven with or dependent upon other parts not appealed from. In other words, unless the interdependence of the separate parts of the judgment appears upon the face of the judgment itself there can be no basis for holding that the part appealed from is so interwoven and connected with the remainder, or so dependent thereon, that the appeal from a part affects the other parts or involves a consideration of the whole judg-

ment. Since the judgment in the case at bar is in two separate and distinct parts or paragraphs and neither makes any reference to the other, there is no basis whatever for a holding that they are in any way interwoven with or dependent upon each other.

The effect of the majority holding in this case is not only to create confusion in the law, as it undoubtedly will, but it places an additional burden on both appellate and trial courts to review portions of judgments from which no appeal is taken in clear violation of the statutory provisions which I have heretofore cited. The right of appeal is clearly statutory as well as the scope of review. The Legislature has sought to limit the power of appellate courts to review only such portions of judgments as may be appealed from. This legislation has a dual purpose. First, to reduce the amount of work required by an appellate court in disposing of an appeal, and second, to limit the issues which may be retried in the trial court in the event of a reversal which should have the effect of saving the time of both the trial court and litigants. It now appears that the majority of this court not only ignores this salutory legislation but overrules the long line of authorities upholding and applying such legislation without even mentioning either the legislation or the authorities. The majority claims the right to do this "in the interests of justice." However, it has been aptly stated that "Justice is what is well established" and that "Justice is compliance with the written laws." I find no basis for the holding of the majority in this case in any concept of justice with which I am familiar.

SCHAUER, J.—I dissent. It is my view that the dissenting opinion of Mr. Justice McComb of the District Court of Appeal, Second District, Division Two (*Osborn* v. *Osborn* (1953; Cal.App.), 256 P.2d 653, 657), correctly disposes of the legal issues presented by the undisputed facts alleged, proved, and found in this case. I shall state the facts in somewhat greater detail than they are stated by Justice McComb in order that I may hereinafter point out those facts which, in my opinion, have caused the majority of this court to announce an erroneous view of the applicable law.

In order to compromise a dispute as to who was entitled to the property of Chloie I. Osborn, deceased mother of plaintiff Merinoeth and wife of Thomas D. Osborn, plaintiff and Thomas on June 27, 1939, executed a contract entitled "Stipulation." The validity of this contract is not questioned. On

July 21, 1939, such contract was filed in the proceeding for probate of the estate of Chloie I. Osborn. It provides in material part that the probate court may set aside disputed real property (Lot 97) to Thomas as having been the homestead of Thomas and Chloie; that Thomas "will execute either by deed, contract or declaration of trust sufficient documents, conveyances or declarations so that . . . Lot 97 . . . will be retained in the name of Thomas D. Osborn, during his lifetime and that the same should vest in his son Merinoeth R. Osborn at the time of the demise of the said Thomas . . . [A]ll income on the property will go to and belong to Thomas D. Osborn during his lifetime and out of the said sum of monies received, he will pay all ordinary and usual expenses, such as, maintenance, taxes, repair and ordinary improvements due to wear and tear. Any surplus from said amounts shall belong to Thomas . . . This Stipulation shall be binding upon the heirs, executors, administrators and assigns of the parties hereto."

Pursuant to this agreement the probate court on July 21, 1939, determined that Lot 97 had been the homestead of Thomas and Chloie and set it aside to Thomas as his separate property.

On July 7, 1939, Thomas signed a grant deed of Lot 97 to plaintiff Merinoeth, "reserving to the grantor the exclusive possession and the use and enjoyment in his own right of the rents, issues and profits of said property . . . during the term of his natural life. This deed is executed in accordance with the terms and conditions of that certain trust agreement of July 7th, 1939, . . . and is subject to all conditions, exceptions and reservations as in said trust agreement provided."

The "trust agreement" of July 7 provides that "the said deed is to be turned over and delivered to the trustees herein [Finkenstein and Warner] to be used, delivered and held under the terms and conditions in this agreement set forth"; the deed shall reserve to Thomas, the grantor, a life estate and "the right to revoke the deed in the event second party [Merinoeth] wilfully harms grantor, and second party reserves the right to cancel this agreement if grantor wilfully harms second party"; the only powers and duties of the trustees are to keep the deed and not record it during the life of Thomas and to deliver it to Merinoeth only on the death of Thomas, and to defend against any attempt by

either party "to break the terms of the within trust agreement"; Thomas "agrees to will any and all right, title, or interest he may have in said real property to" Merinoeth; the agreement is binding on the heirs, executors, and assigns of the parties; and "the wilful failure or refusal of either party to comply with the obligations herein provided, on his part to be performed, shall permit either party to rescind this agreement and shall confer upon the grantor the right to cancel the within mentioned deed and this agreement."

On January 14, 1946, Merinoeth, Thomas, and the trustees executed an "agreement cancelling trust agreement." In March, 1946, by an exchange of letters, the parties agreed to rescind the cancellation agreement. These two agreements were executed in the course of unsuccessful negotiations between Thomas and plaintiff for the purchase by Thomas of plaintiff's interest in Lot 97. Evidence of the negotiations and the cancellation agreements and accompanying letters has probative value as it tends to show that Thomas recognized that Merinoeth had a valuable remainder interest.

The opinion of Justice McComb disposes of the issues raised by the above stated facts in the following manner:

"*Questions:* First: *Did the trial court properly decline to quiet title in the parcel of land in question in plaintiff?*

"*Yes.* The following rules are here pertinent:

"(1) An escrow is a written instrument or personal property which is delivered to a third party by the grantor, maker, promisor or obligor to be held by the depositary until the happening of a designated event or the performance of a designated condition and then to be delivered to the grantee, promisee or obligee. (Civ. Code, § 1057. See also cited cases in 10 Cal.Jur. [1923] Escrows, § 1, n. 2, p. 576.)

"(2) When a deed is deposited by a grantor with a third person to be handed to the grantee on the death of the grantor . . . without any intention of a present transfer of title, but on the contrary, with the intention of the grantor to reserve the right of dominion over the deed and the right to revoke or recall it there is no effective delivery. . . . (*Williams* v. *Kidd* [1915], 170 Cal. 631, 637 et seq. [151 P. 1, Ann.Cas. 1916E 703].)

"(3) Plaintiff in a quiet title action must depend on the strength of his own title and not on the weakness of that of defendant. Thus, if he fails to prove title in himself, he is not entitled to recover. (*Alspach* v. *Landrum* [1947], 82 Cal.App.2d 901, 903 [1] [187 P.2d 130]; *Tanner* v. *Title*

*Ins. & Trust Co.* [1942], 20 Cal.2d 814, 825 [13] [129 P.2d 383].)

"Applying the foregoing rules to the facts in the present case we find that under rule (1) the handing of the deed to defendants Finkenstein and Warner created an escrow, and since Mr. Osborn reserved the right to revoke or cancel the deed upon the happening of certain conditions, there was no intent to make an unconditional delivery of the deed. Therefore, it not having been delivered to plaintiff prior to his father's death, under rule (2) the deed was never delivered and no title passed to plaintiff. Hence, under rule (3), plaintiff having failed to prove title in himself the trial court properly held that he was not entitled to have title quieted in him.

"Second: *Was there substantial evidence to sustain the trial court's finding that the transaction between the parties did not create a trust agreement but merely created an escrow?*

"*Yes.* The transaction falls squarely within the definition of an escrow as set forth under rule (1) *supra.* There is a total absence of any of the elements of a trust agreement. Therefore the court's finding is supported by substantial evidence.''

The majority herein proceed upon the fallacious premise that ''Thomas was bound by the terms of the trust agreement, executed contemporaneously with the deed, not to attempt to recall the deed from the possession of the trustees . . . Thomas did not retain control over the deed after he delivered it to the trustees. There is nothing in the trust agreement, or external to it, to indicate that Thomas did not intend the transmission of the deed to the trustees to be a valid legal delivery.'' Obviously such ''finding'' by the majority invades the province of the trier of fact and draws inferences from both the documents and the surrounding circumstances contrary to those drawn by the trial judge. Why was an escrow created and conditions for cancellation specified if the delivery was unconditional? Furthermore, I cannot agree that ''Thomas was bound by the terms of the trust agreement.'' The signing by Thomas of the July 7 trust agreement and deed was, at best, an ineffective attempt to perform the June 27 agreement. It appears that the June 27 agreement, rather than the trust agreement, was binding and enforceable. And the June 27 agreement has never been discharged by performance or otherwise.

The majority opinion here appears to be an attempt to give, or to lay the foundation for giving, plaintiff Merinoeth and the nonappealing cross-complainant Louise a remedy akin to quasi-specific enforcement of the June 27 agreement. But that is a remedy which Merinoeth should have sought against the representatives of the estate of his deceased father, and Merinoeth has not seen fit to institute such proceedings and proceed on such a theory.

For the reasons above stated I should affirm the judgment.

Appellant's petition for a rehearing was denied March 25, 1954. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.