Filed 10/16/13  Marriage of Damlykyan and Papazian CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re the Marriage of TAGUI T. DAMLAKYAN and GARO PAPAZIAN. | B243531 |
| TAGUI T. DAMLAKYAN, | (Los Angeles County Super. Ct. No. ED034380) |
| Respondent, | |
| v. | |
| GARO PAPAZIAN, | |
| Respondent; | |
| FRANK O. FOX et al., | |
| Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dianna Gould-Saltman, Judge.  Affirmed.

The Law Firm of Fox and Fox, Claire S. Fox and Frank O. Fox for Appellants.

Garo Papazian, in pro. per. for Respondent.

_____

This appeal arises from a post-judgment order in a marital dissolution action expunging any interest held by appellant Frank O. Fox in community real property owned by respondents Tagui Damlakyan and Garo Papazian. Following a bifurcated judgment of dissolution, Damlakyan retained Fox to represent her at a trial on all reserved issues pursuant to a contingency fee agreement under which Damlakyan would pay Fox 35 percent of any funds or property that she recovered. Prior to a judgment on the reserved issues, Damlakyan executed a grant deed transferring a 35 percent interest in the family residence to Fox, which Fox recorded shortly after the judgment was entered. In a subsequent order to show cause proceeding brought by Papazian, the trial court ordered that Fox's interest in the residence be removed and thereafter denied Fox's motion to vacate that order and reinstate his interest. For the reasons set forth below, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Initiation of Marital Dissolution Proceedings

Damlakyan and Papazian were married in June 1993. In February 2005, the parties separated and Damlakyan initiated marital dissolution proceedings. On April 18, 2007, the trial court entered a bifurcated judgment of dissolution and reserved jurisdiction over all other issues. Trial on the reserved issues commenced in February 2009, at which time Damlakyan was representing herself. On February 23, 2009, the trial court made a finding that the family residence located at East Palm Avenue in Burbank, California was the sole and separate property of Papazian, and that Damlakyan had not proven otherwise. The court proceeded with the trial on all remaining reserved issues.

### II. Damlakyan's Contingency Fee Agreement with Fox

In March 2009, during the trial on the reserved issues, Damlakyan retained Fox to represent her in the dissolution proceedings. Fox filed a substitution of attorney with the trial court on March 19, 2009. Approximately four months later, on July 15, 2009, Damlakyan entered into a written retainer agreement with Fox.

2

The retainer agreement, which provided that Damlakyan did not have to pay an initial retainer for attorney's fees or costs, included the following contingency fee provision: "CLIENT agrees to pay ATTORNEY the following contingent fee: [¶] Thirty-Five percent (35%) of any funds, personal property and real property received by CLIENT, regardless of whether the matter proceeds to arbitration or trial. This will not include any order requiring Garo Papazian to pay the obligation to the District Attorney's Office. [¶] In addition to said amount, CLIENT agrees to pay all attorney's fees and/or sanctions ordered in these proceedings. In addition to the aforementioned fees, CLIENT shall pay all costs involved in this action and ATTORNEY shall be entitled to any fees or costs ordered by the Court in favor of CLIENT. [¶] In the event of ATTORNEY'S discharge, or withdrawal, CLIENT agrees that the Contingency Fee hereinabove set forth shall remain due and payable to ATTORNEY. [¶] The rates set forth above are not set by law, but are negotiable between an attorney and client." The agreement also included a lien provision that expressly authorized Fox "to obtain a lien as security for payment by either a Note Secured by Deed of Trust against real or personal property and other forms of security for payment."

### III. Damlakyan's Execution of a Grant Deed on the Family Residence

On January 20, 2010, prior to a judgment on the reserved issues, Damlakyan executed a grant deed in which she purported to convey "a thirty-five (35%) interest to FRANK O. FOX of The Law Firm Of Fox And Fox, a general partnership composed of Frank O. Fox And Claire S. Fox, and a sixty-five (65%) interest to Tagui T. Damlakyan, an individual," in the Palm Avenue residence. At the time she executed the grant deed, Damlakyan was aware that a final judgment in the dissolution proceedings had not been entered. According to Damlakyan, she executed the grant deed during the trial on the reserved issues at Fox's request. Fox did not immediately record the deed.

3

## IV. Judgment on the Reserved Issues

On March 12, 2010, following a contested hearing, the trial court entered its judgment on the reserved issues. The judgment was signed by the trial court and by Fox on behalf of Damlakyan. It included provisions for child custody and visitation, child support and spousal support, and payment of community debts. It also included a provision for the disposition of the Palm Avenue residence. As set forth in the judgment, the residence was deemed to be the community property of both parties, and title was to be held in their names as tenants in common effective immediately. The judgment provided that the residence "shall be immediately listed for sale and sold," and that "[b]oth parties shall cooperate with all aspects, and sign all documents, which may be necessary to list and sell the [residence] as quickly as possible." The judgment further provided that the net proceeds from the sale of the residence "shall be first used to pay the community obligation" that was owed to the State of California, and that the "remaining balance shall be divided in half," and subject to certain child support arrearages owed by Papazian, "shall be paid to the parties." The trial court reserved jurisdiction to make other orders necessary to carry out the judgment.

On March 16, 2010, four days after entry of the judgment on the reserved issues, Fox recorded the grant deed that Damlakyan had executed on January 20, 2012. On the same day he recorded the deed, Fox filed a notice of withdrawal as attorney of record for Damlakyan in the dissolution proceedings.

## V. Stipulation to Amend the Judgment on the Reserved Issues

On March 19, 2010, Damlakyan and Papazian entered into a written stipulation to amend the judgment on the reserved issues. The stipulation provided that Papazian would pay Damlakyan an equalization payment totaling $170,000 in exchange for Damlakyan relinquishing all interest in the Palm Avenue residence. The payment would be made to Damlakyan over a two-year period in accordance with a fixed payment schedule, and upon full payment, Damlakyan would execute a deed transferring all of her interest, title, equity, and rights in the residence to Papazian. The stipulation also

4

provided that Papazian was not responsible for any outstanding attorney's fees owed by Damlakyan to Fox, but it did not make any reference to the interest in the residence recorded by Fox. The stipulation was submitted to and approved by the trial court on April 12, 2010.[1]

As of early 2012, Papazian still owed Damlakyan $136,000 of the stipulated $170,000 equalization payment. At some point, Papazian applied for a home equity line of credit secured by the Palm Avenue residence to pay Damlakyan the remaining balance due. When his loan application was rejected, Papazian learned that Fox had recorded a grant deed on the residence and that the interest held by Fox was precluding Papazian from obtaining an equity line of credit on the property.

Papazian and his attorneys thereafter contacted Fox about releasing his interest in the residence. According to Papazian, Fox demanded a payment of $108,000 to release his interest. Papazian advised Damlakyan of the amount demanded by Fox, and asked Damlakyan to pursue an arbitration of the attorney's fees owed to Fox so that a final amount could be determined and paid. Damlakyan responded that she believed her attorney's fees obligation did not concern Papazian and that she would pay the money she owed to Fox once Papazian paid the money he owed to her.

In a January 2012 letter to Papazian's attorney about his interest in the Palm Avenue residence, Fox stated that he had no dispute with Damlakyan concerning his attorney's fees, but if Papazian had any issue with Fox's interest in the property, his sole remedy would be to file a quiet title action in a separate civil proceeding. Fox also

---

[1] In June 2010, Damlakyan and Papazian entered into two amendments to the stipulation in which they agreed to a partial modification of the payment schedule. The parties also agreed that Papazian would withhold 35 percent of the $170,000 equalization payment and deposit those funds into a separate account which would be made available to Damlakyan to pay the attorney's fees owed to Fox once the actual amount of fees owed was known. Although signed by the parties, it appears neither amendment was submitted to the trial court for approval.

stated that, if Papazian chose to file any such action, Fox would file a cross-complaint to partition and sell the property.

## VI.     Order to Show Cause Proceedings

On May 29, 2012, Papazian, representing himself, filed an application for an order to show cause (OSC) in which he requested the court to:  (1) order Damlakyan to remove a child support lien from the Palm Avenue residence; (2) order Damlakyan to present the court with a writing from Fox setting forth the amount of attorney's fees owed by Damlakyan; and (3) set a deadline of 60 days for Damlakyan to present the court with the total amount of attorney's fees owed to Fox by Damlakyan.  In a supporting declaration, Papazian explained the basis for his requested relief as follows:  "Currently, due to the disagreements between [Damlakyan] and her attorney I am unable to make the payments required under the Stipulation.  I need to take a home equity line of credit against the property to make the payment.  However, due to the adverse interest of Mr. Fox recorded on the [p]roperty I am unable to do so.  I need to know how much money is due to Mr. Fox so that I can properly pay that amount."  Papazian did not serve a copy of his OSC application or supporting papers on Fox.

On July 10, 2012, Damlakyan, representing herself, filed a declaration in opposition to Papazian's application.  In her declaration, Damlakyan stated that Papazian had not complied with the amended judgment because he had failed to make timely payments to her and had refused to make any further payments until she sought a fee arbitration with Fox.  She also stated that she believed the amount of attorney's fees owed to Fox was a matter between her and Fox, and that "the fact that Mr. Fox placed a lien against the property is a matter of discussion between Mr. Fox and Garo Papazian and as such should be a matter settled between them."

## VII.    The August 2, 2012 Order Expunging Fox's Interest in the Family Residence

On July 10, 2012, the trial court held the OSC hearing.  Papazian appeared with his attorney and Damlakyan represented herself.  Fox was not joined as a party to the proceedings or otherwise given notice of the hearing.  Papazian's attorney explained to

6

the trial court that Papazian did not dispute that he owed Damlakyan $136,000, but he was unable to pay the balance due until he obtained a home equity line of credit and was given a "clear breakdown" of how much money should be distributed to Damlakyan and to Fox. Papazian's attorney initially represented to the trial court that Fox's interest in the Palm Avenue residence was in the nature of a family law attorney's real property lien. However, the attorney later clarified that Damlakyan had a contingency fee agreement that entitled Fox to 35 percent of her total recovery and that Fox had recorded a grant deed from Damlakyan that gave him 35 percent of her one-half interest in the residence.[2] Papazian's attorney noted that Fox's adverse interest in the property appeared to be unlawful.

Upon hearing these facts, the trial court requested and reviewed copies of the contingency fee agreement and the grant deed. Damlakyan then testified under oath that she signed the grant deed at Fox's request on January 20, 2010, prior to the final judgment in the case. Damlakyan also testified that, based on her contingency fee agreement, Fox was entitled to 35 percent of the $170,000 equalization payment that Papazian owed to her, and that she already had paid Fox a portion of his contingency fee and currently owed him a balance of $27,000. After confirming that the automatic temporary restraining orders were still in effect at the time Damlakyan executed the grant deed, the trial court stated that it was inclined to order that any liens or interest held by Fox on the residence be removed so that Papazian could obtain a home equity line of credit, and to order Papazian to pay $136,000 to Fox's client trust account for Damlakyan pending resolution of their attorney's fees dispute. In response to the trial court's proposed order, Papazian's attorney stated "that will be ideal for us, your honor."

---

**2** While the parties characterized Fox's interest in the residence as 35 percent of Damlakyan's one-half community property interest, the deed itself reflected otherwise. It stated that Fox was granted a 35 percent interest in the residence and that Damlakyan was granted a 65 percent interest. It did not restrict the grant to a share of Damlakyan's interest, nor did it make any reference to the interest held by Papazian.

7

On August 2, 2012, the trial court entered a written order removing any liens or interest held by Fox in the Palm Avenue residence to allow Papazian to obtain a credit line or loan secured by the property. The order further provided that, immediately upon obtaining the loan or credit line, Papazian would pay Damlakyan $136,000 in a check made payable to Fox's client trust account until Damlakyan and Fox resolved the issue of attorney's fees. Papazian's counsel was directed to serve a copy of the trial court's order on Fox.

## VIII. Fox's Motion to Vacate the August 2, 2012 Order

On July 12, 2012, two days after the OSC hearing, Fox filed a separate civil action against Damlakyan and Papazian seeking to quiet title and partition the Palm Avenue residence for sale. On August 10, 2012, after learning of the OSC proceedings from Damlakyan, Fox filed an ex parte application in the dissolution action requesting that the trial court's August 2, 2012 order be vacated and that Fox's interest in the residence be reinstated. The trial court denied Fox's request for ex parte relief, but ordered that his motion to vacate be heard on shortened time. The matter was set for hearing on August 17, 2012.

In his moving papers, Fox argued that the August 2, 2012 order was void because he never was joined in the action as an indispensable party or otherwise given notice of the OSC proceedings. Fox also asserted that he did not acquire his interest in the residence until he recorded the deed on March 16, 2010, after the judgment on the reserved issues had been entered and the automatic restraining orders had been dissolved. Fox further contended that, because his interest in the residence was separate and distinct from the interests of Damlakyan and Papazian, the parties could enter into an agreement or seek a court order affecting the disposition of their own interests, but could not modify Fox's interest without his express agreement. In addition, Fox claimed that there was no outstanding fee dispute with Damlakyan because full payment of his attorney's fees had been completed upon his recordation of the deed.

8

**IX. The August 17, 2012 Order Denying Fox's Motion to Vacate**

On August 17, 2012, the trial court held the hearing on Fox's motion to vacate the order expunging his interest in the Palm Avenue residence. The hearing was attended by Fox and counsel for Papazian. In addition to objecting to the order on due process grounds, Fox argued that the grant deed transfer made by Damlakyan was not a family law attorney's real property lien, but rather a payment on a contingency fee which was permitted in a post-dissolution proceeding. Fox also asserted that, because the transfer was not a lien, the Family Code did not require notice to Papazian. Fox admitted at the hearing that Damlakyan did not actually hold any interest in the residence when she signed the grant deed, but reasoned that her signing of the deed could not have violated the automatic temporary restraining orders precisely because she had no interest in the property at the time. Fox reiterated that the grant deed was not recorded until Damlakyan acquired an interest in the property, and argued that once the deed was recorded, his interest could not be altered by the parties.

The trial court found that the date on which the deed was signed by Damlakyan, rather than recorded by Fox, was dispositive, and that such signing took place without notice to Papazian while the automatic restraining orders were still in effect. The court further found that Fox's use of a grant deed transfer was an attempt to avoid the Family Code provisions for obtaining a lien, and that as a lien, the transfer was void. The court also expressed concern that Fox's actions with respect to the property had prevented the parties from obtaining a loan that they needed to comply with the terms of the judgment, and that such conduct created an actual conflict of interest with Damlakyan in violation of the Rules of Professional Conduct. The court noted that Fox was entitled to seek the payment of his attorney's fees, but to the extent such fees were greater than the amount to be paid into his client trust account, Fox would have to recover his fees through other means. After confirming that the parties had no further argument on the matter, the trial court ruled that its prior order would stand. On August 17, 2012, the trial court entered its order denying Fox's motion to vacate the order expunging his interest in the property.

9

Following the denial of his motion to vacate, Fox filed an appeal from the trial court's August 2, 2012 and August 17, 2012 orders.

## DISCUSSION

On appeal, Fox argues that the trial court erred in expunging his interest in the Palm Avenue residence and in denying his motion to vacate the expungement order. Fox contends that the contingency fee agreement with Damlakyan was valid because Damlakyan entered into the agreement two years after the judgment of dissolution and had no other financial means of retaining counsel to represent her at the trial on the reserved issues. Fox claims that the grant deed transferring an interest in the residence to him was also valid because Damlakyan did not intend for the deed to take effect until a final judgment in the action had been entered and the automatic temporary restraining orders had been dissolved. Fox further asserts that the expungement order is void as a matter of law because trial court could not adjudicate his interest in the property without joining him as a party to the action or giving him notice of the OSC proceedings.

## I. Relevant Law on Attorney's Fees Agreements in Dissolution Proceedings

Contingency fee agreements in marital dissolution actions are generally disfavored and may be void as against public policy. Where a party seeking to procure a divorce enters into a fee agreement that is contingent upon his or her success in the action, the attorney acquires a personal economic interest in preventing the reconciliation of the parties, and the agreement is void as against the public policy favoring reconciliation. (*Newman v. Freitas* (1900) 129 Cal. 283, 289-293; *Coons v. Kary* (1968) 263 Cal.App.2d 650, 652-654; *Theisen v. Keough* (1931) 115 Cal.App. 353, 356-358.) The California Supreme Court has explained, however, that "[t]here should not be a dogmatic condemnation of every contingent fee contract in a divorce action regardless of distinguishable circumstances," and "[r]ather the validity of such contract should be determined in the light of the factual background of the particular case and considerations of public policy appropriate thereto." (*Krieger v. Bulpitt* (1953) 40 Cal.2d 97, 100.)

Contingency fee agreements in dissolution actions thus have been upheld in narrow circumstances, such as when a party to a pending divorce proceeding is otherwise unable to reimburse an attorney for services rendered in the action and no other public policy considerations are implicated by the agreement. (*Id*. at pp. 100-101; see also *Coviello v. State Bar* (1955) 45 Cal.2d 57, 60-61; *Mahoney v. Sharff* (1961) 191 Cal.App.2d 191, 194.) Nevertheless, because of the potential for conflicts of interest and other violations of public policy, the validity of such agreements must be closely scrutinized.[3]

Additionally, whether based on hourly or contingent fees, attorney's fees contracts in dissolution proceedings must comply with the relevant provisions of the Family Code. Section 1102 of the Family Code states that, subject to certain exceptions, "either spouse has the management and control of the community real property, . . . but both spouses, either personally or by a duly authorized agent, must join in executing any instrument by which that community real property or any interest therein is . . . sold, conveyed, or encumbered." (Fam. Code, § 1102, subd. (a).)[4] Section 2040 restrains the parties, upon service of a petition for dissolution, from "transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life." (§ 2040, subd. (a)(2).) These mutual restraining orders take effect automatically

---

[3]     The California State Bar has issued a formal advisory opinion concerning the propriety of contingency fee agreements in marital dissolution proceedings. (State Bar Standing Com. on Prof. Responsibility & Conduct, Formal Op. No. 1983-72.) The opinion states that contingency fee agreements based on the value of community property assets recovered in the action are not per se improper provided that they do not violate public policy by promoting divorce or involving the attorney in a conflict of interest with the client. (*Ibid*.) The opinion further states that the propriety of a contingency fee agreement may depend upon the issues to be resolved in the dissolution proceedings, and that the attorney must take care that the agreement does not affect his or her duty of undivided fidelity to the client's interest. (*Ibid*.)

[4]     Unless otherwise stated, all further statutory references are to the Family Code.

11

upon commencement of a dissolution action and remain in effect until a final judgment in the action or further order of the court. (§§ 233, subd. (a), 2040.)

Subject to specific statutory requirements, however, the Family Code does permit either party to unilaterally "encumber his or her interest in community real property to pay reasonable attorney's fees in order to retain or maintain legal counsel in a proceeding for dissolution of marriage." (§ 2033, subd. (a).) This encumbrance is known as a family law attorney's real property lien, or FLARPL, and attaches only to the encumbering party's interest in the community real property. (§ 2033, subd. (a).) The Family Code sets forth strict notice requirements and procedures for the encumbering party to obtain a FLARPL and for the non-encumbering party to object to the lien prior to recordation. (§ 2033, subds. (b), (c).) The family law court may deny or limit the lien based on the circumstances of the case and has jurisdiction to resolve any dispute arising from the existence of a FLARPL. (§ 2034.)

Certain attorney's fees contracts in marital dissolution actions also must comply with rule 3-300 of the California Rules of Professional Conduct (rule 3-300), which requires the client's informed written consent to the attorney's acquisition of an interest adverse to the client.[5] In considering the scope of rule 3-300, the California Supreme Court has stated that, "[a]lthough it is difficult to anticipate with precision the myriad of transactions that may arise between an attorney and a client, an attorney generally 'must avoid circumstances where it is reasonably foreseeable that his acquisition may be detrimental, i.e., adverse, to the interests of his client.' [Citation.]" (*Fletcher v. Davis*

---

[5] Rule 3-300, entitled "Avoiding Interests Adverse to a Client," provides as follows: "A member shall not . . . knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied: [¶] (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and [¶] (B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and [¶] (C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition."

(2004) 33 Cal.4th 61, 67.) Among other transactions, an attorney acquires an adverse interest when he or she acquires "'an interest in the subject matter of the litigation for which [the attorney] had been retained,'" an interest in the client's property that "'can be used to summarily extinguish the client's interest,'" or an interest in the client's recovery that "could significantly *impair* the client's interest by delaying payment of the recovery . . . until any disputes over the [attorney's interest] can be resolved." (*Id*. at pp. 68-69 [attorney's charging lien against client's future recovery as security for payment of hourly fees was adverse]; see also *Hawk v. State Bar* (1988) 45 Cal.3d 589, 600-601 [attorney's promissory note secured by deed of trust in client's real property was adverse]; *Ames v. State Bar* (1973) 8 Cal.3d 910, 919-920 [attorney's purchase of note secured by deed of trust on property that was subject of litigation was adverse].) While rule 3-300 does not bar an attorney from acquiring an interest that is adverse to the client, it does require strict compliance with each of its informed consent provisions for such interest to be enforceable. (*Fletcher v. Davis*, *supra*, at pp. 71-72.)

## II. The Trial Court Did Not Err In Expunging Fox's Interest in the Palm Avenue Residence.

The contingency fee agreement signed by Damlakyan provided that she would pay Fox 35 percent of any funds, personal property, or real property that she recovered in the dissolution proceedings. It also provided that Fox was authorized to obtain a lien against Damlakyan's real property as security for payment of his attorney's fees. Fox, however, did not do so, but instead sought to acquire an actual ownership interest in the residence by arranging for Damlakyan to transfer a 35 percent interest in the property to Fox as payment for his fees. At Fox's request, Damlakyan executed the grant deed prior to a final judgment in the action while the automatic temporary restraining orders were still in effect. She also executed the grant deed prior to obtaining any recovery in the action while Fox was still representing her at the trial on the reserved issues.

Fox argues that Damlakyan only intended for the grant deed to take effect upon entry of the judgment on the reserved issues in the event she was awarded a community

13

property interest in the residence under the judgment. Fox also asserts that Damlakyan could not have intended for the deed to take effect prior to the judgment being entered because she did not acquire an ownership interest in the property until that time. As the parties acknowledge, a grant deed "takes effect, so as to vest the interest intended to be transferred, only upon its delivery by the grantor." (Civ. Code, § 1054.) "Delivery is a question of intent." (*Osborn v. Osborn* (1954) 42 Cal.2d 358, 363.) "A valid delivery of a deed depends upon whether the grantor intended that it should be presently operative, and a manual transfer is not conclusive evidence of such intention. [Citations.]" (*Huth v. Katz* (1947) 30 Cal.2d 605, 608.) Nevertheless, the grantee's possession of the deed at the time of recordation gives rise to an inference that it was duly delivered, and a duly executed and delivered deed is presumed to have been delivered at its date of execution. (Civ. Code, § 1055; *20th Century Plumbing Co. v. Sfregola* (1981) 126 Cal.App.3d 851, 853; *T W M Homes, Inc. v. Atherwood Realty & Inv. Co.* (1963) 214 Cal.App.2d 826, 846.) While the presumption of delivery upon execution may be overcome by evidence of a contrary intent by the grantor, no such evidence was offered in this case.

Damlakyan never stated in either her declaration or her testimony before the trial court that she intended for the grant deed to take effect upon entry of a final judgment or at some time other than her date of signing.[6] In his declaration, Fox stated that the deed was "executed" by Damlakyan after the entry of the judgment on the reserved issues; however, Fox's statement was inconsistent with Damlakyan's testimony at the OSC hearing and with the date of execution reflected in the deed. The deed itself did not contain any conditions precedent to the transfer of title. While the contingency fee

---

**6**      In fact, the record suggests that Damlakyan may not have fully understood the legal significance of a grant deed. In her declaration, she described Fox's interest in the residence as a lien. In her testimony, she described Fox's interest as a right to receive 35 percent of the money to be paid to her by Papazian for her interest in the property. None of Damlakyan's statements in the OSC proceedings show that she intended to transfer an ownership interest in the property to Fox as payment for his attorney's fees. However, Damlakyan did admit to signing the deed on January 20, 2010, prior to a final judgment in the case.

agreement provided that Fox would be paid 35 percent of the real property recovered by Damlakyan, it did not describe the method of such payment or when it would take effect. Therefore, in the absence of any evidence of a contrary intent, the trial court reasonably could find that the effective date of the deed was the date of execution by Damlakyan when the automatic temporary restraining orders remained in effect.

Based on the totality of circumstances surrounding the transfer, the trial court also reasonably could find that Fox acted to circumvent the laws that were intended to restrict parties in a dissolution action from unilaterally transferring their property interests prior to a final judgment in the case. First, while contingency fee agreements in dissolution proceedings are not per se unenforceable, they are disfavored and may create a conflict of interest with the client. By requiring Damlakyan to grant him an interest in property that was the subject of the pending litigation, Fox acquired an interest that was adverse to his client, thus triggering a duty to comply with rule 3-300. The contingency fee agreement reflects that Fox did obtain Damlakyan's informed written consent to a lien against her property as security for payment of his fees. It does not, however, reflect that Damlakyan gave her informed written consent to Fox's acquisition of an ownership interest in her property while he was representing her in the dissolution proceedings.

Second, at the time Fox requested Damlakyan execute the grant deed, he knew that the automatic restraining orders remained in effect. He also knew that the trial court previously had found that the Palm Avenue residence was the sole and separate property of Papazian and that Damlakyan was seeking to challenge that finding at trial and to have the residence declared the community property of both parties. Despite such knowledge, Fox had Damlakyan sign a deed granting him an ownership interest in the residence at a time when Damlakyan did not hold any such interest herself. Moreover, the deed that Fox prepared did not restrict his interest in the residence to a share of the community property interest that might be awarded to Damlakyan. Rather, it purported to transfer the entire interest in the property to the two of them, with Fox receiving a 35 percent interest and Damlakyan receiving a 65 percent interest. The deed made no mention of any interest held by Papazian, and Papazian was not given notice of it.

15

Third, at the time the trial court entered its judgment on the reserved issues, Fox knew that Damlakyan's prior execution of the deed could affect the distribution of the parties' community property and their ability to comply with the terms of the judgment. In particular, Fox knew that the judgment required that the Palm Avenue residence be immediately listed for sale and sold with the parties taking all necessary actions to ensure the prompt sale of the residence. He also knew that the net proceeds from the sale were to be used to satisfy the parties' community debt obligations with the remaining balance to be divided equally between them. Consequently, at the time Fox signed the judgment on behalf of his client, he either knew or should have known that Damlakyan might not be able to perform under the terms of the judgment because Fox had acquired an ownership interest in the property that could impede the parties' ability to immediately sell it. Yet there is nothing in the record to suggest that Fox disclosed the existence of the grant deed to the trial court prior to the entry of judgment on the reserved issues. Instead, the record reflects that, a mere four days after entry of the judgment, Fox had the deed recorded. That same day, he withdrew as counsel for Damlakyan.

Based on this record, there was substantial evidence to support the trial court's finding that Fox failed to comply with the Family Code and the Rules of Professional Conduct when he acquired and recorded an ownership interest in the Palm Avenue residence. We accordingly conclude that the trial court did not err in expunging Fox's interest in the residence.

### III. The Trial Court Should Have Joined Fox as a Party to the OSC Proceedings, But The Error Was Harmless.

Fox also contends that the trial court lacked jurisdiction to adjudicate his interest in the Palm Avenue residence because he was not joined as an indispensable party in the action. We agree that Fox should have been joined as a party to the OSC proceedings, or at a minimum, should have been given notice of the proceedings and an opportunity to be heard prior to the entry of an order expunging his interest. (*In re Marriage of Ramirez* (2011) 198 Cal.App.4th 336, 344-345 [attorney lienholder is an indispensable party to a

16

motion to vacate a FLARPL and must be joined in the action or given notice and an opportunity to object]; *In re Marriage of Turkanis & Price* (2013) 213 Cal.App.4th 332, 354 [attorney lienholder need not be joined as a party to a trial on property allocation, but should be joined in a post-trial motion to vacate a FLARPL].)  However, the remedy for the trial court's error in expunging Fox's interest absent joinder or proper notice would be to remand the matter to the trial court for further proceedings to allow Fox an opportunity to object.  The trial court already granted such relief by agreeing to hear Fox's motion to vacate the expungement order and ultimately ruling on the merits of the motion.  The trial court denied the motion to vacate based on a finding that Fox had acquired his interest in violation of the Family Code and Rules of Professional Conduct, and as discussed, that finding was supported by substantial evidence.  The order expunging Fox's interest in the property was therefore valid as of the date the trial court denied the motion to vacate and held that its prior order would stand.

Fox claims that the trial court also lacked jurisdiction to expunge his interest in the residence because neither Papazian nor Damlakyan requested such relief.  While it is true that Papazian did not specifically seek an expungement order in his OSC application, he initiated the proceedings because Fox's interest in the property was precluding him from obtaining a home equity line of credit, which Papazian contended was necessary for him to comply with the terms of the amended judgment.  Additionally, Papazian's attorney raised the validity of Fox's interest as an issue at the OSC hearing and responded to the trial court's proposed expungement order by stating that such relief "will be ideal."  Given that the trial court retained jurisdiction to make any orders necessary to carry out the terms of the judgment, it was not limited to granting the specific form of relief sought by Papazian in his moving papers.

17

## DISPOSITION

The trial court's August 2, 2012 order expunging Fox's interest in the Palm Avenue residence and its August 17, 2012 order denying Fox's motion to vacate the expungement order are affirmed. Papazian shall recover his costs on appeal. The clerk of this court is to forward a copy of this opinion to the State Bar of California.


ZELON, J.


We concur:


PERLUSS, P. J.


WOODS, J.