[Civ. No. 7237. First Appellate District, Division One.—January 29, 1930.]

A. S. MORGAN et al., Respondents, v. HENRY H. MATTHIESON et al., Appellants.

George M. Harker and H. J. Brady for Appellants.

G. R. Dexter and Raymond S. Taylor for Respondents.

JOHNSON, J., *pro tem.*—This is an action by two of the three executors of the will of J. J. Morgan, deceased, to cancel a certain deed purporting to have been made by the decedent to the defendant Willa Matthieson, but not recorded until after the maker's death.

The defendant Henry H. Matthieson, being one of the executors as well as the husband of the defendant Willa Matthieson, did not join his fellow executors in prosecuting the action; and though named as a defendant in his indi-

vidual as well as his representative capacity, he filed a disclaimer, leaving the defense of the action to his wife.

The point in controversy is as to delivery of the deed in question; and judgment having gone in favor of the estate, Mrs. Matthieson took this appeal.

The decedent, J. J. Morgan, a resident of Hollywood, who lived to the age of about eighty-four years, had known Mrs. Matthieson and her sister, Eleanor McIntyre, for about twenty-five years prior to his death, which occurred on May 31, 1925. The women, who were in the habit of calling Morgan Uncle Jerry, were distantly related to him by marriage. Morgan, though eccentric and illiterate, was an intelligent, strong-willed, shrewd man of business, and had amassed an estate valued close to a million and a half dollars. He had married twice, had six children and certain grandchildren, but had been divorced from his second wife. After his divorce he arranged with Mrs. McIntyre to keep house for him. She was about forty-four years his junior; and about six months before his death a written contract, dated November 10, 1924, had been made between Morgan and Mrs. McIntyre, which, after reciting an agreement to marry, obligated Morgan on or before the day of the marriage to convey to Mrs. McIntyre as her separate estate an undivided half interest in his home place, known as No. 1836 Taft Avenue, Hollywood. And by way of an antenuptial settlement, Morgan further agreed, at the end of each of four quinquennial periods following marriage, to pay to Mrs. McIntyre certain fixed sums aggregating $62,100, the successive payments being made conditional, however, upon the continuance of Morgan's life, and being intended to remove "all and every temptation that might spring up along life's journey." The wedding was postponed several times, but never took place.

The relations between Morgan and the Matthiesons were friendly. Mrs. Matthieson was called somewhat frequently to relieve her sister in the care of Morgan; and Mr. Matthieson's co-operation was sometimes sought by Morgan in business matters.

Morgan seems at various times to have indulged in promises of conveyances to Mrs. Matthieson and her sister; but he delighted more in promises than in performance. He did, however, give each of them a legacy of $5,000 in his will.

According to Matthieson's testimony, about a month and a half before Morgan died he sent for Matthieson. When Matthieson arrived at the house, Morgan declared that he was going to make deeds to some "loved ones," whom he did not then name, but whom he said he had promised at different times to pay for what they had done for him. He wanted, however, to be sure that his interests were protected, as he put it; and after several conferences Matthieson was instructed on April 20, 1925, to have a deed drawn to his wife for the property in suit, another deed to Mrs. McIntyre for the home place, and two other deeds to two of the grandchildren, Hazel Knapp and Earl Pollock. The deeds were prepared, and were signed and acknowledged by Morgan on April 21st.

These four deeds were then delivered into the possession of Matthieson with a letter dated April 20th, drafted by Morgan, and after correction typed and signed in duplicate, one copy being kept by Morgan, the other by Matthieson. This letter stated that the deeds were to be held in trust by Matthieson, subject to surrender to Morgan on demand at any time during his life. The letter closed with this further injunction: "In the event of my death, you are to record these deeds at once, provided no circumstances arise which would cause doubt in your mind. At no time and under no other consideration are they to be so recorded." At the foot of the letter Morgan had Matthieson sign an acceptance of the trust with an agreement not only to perform the duties undertaken, but also to pay Morgan all damages growing out of failure in any particular.

The story of delivery of the deeds, as pieced together from the testimony given in behalf of Mrs. Matthieson by her husband, her sister and herself, is as follows: Morgan and Matthieson went together to the notary's office on April 21st. There the deeds were acknowledged; and as they left the office, the deeds were handed by Morgan to Matthieson, who already had his copy of the letter of April 20th. The two men then returned to Morgan's house. Hardly had they arrived when Morgan asked Matthieson for Mrs. McIntyre's deed; and on receiving it, Morgan turned to Mrs. McIntyre, then present, and handed her the deed, saying that he gave her the property for faithful service, and because of their marriage contract; and that the place was now her home.

Nevertheless, he asked her not record the deed, stating that there might be objection from his children, and that for his better contentment he wished her to return the deed to Matthieson to hold for her. This she did; and after she had left the room, Morgan remarked that that deed was "out from under the agreement."

Then before Matthieson left the house, Morgan asked him to bring Mrs. Matthieson that evening, saying he wished to deliver her deed to her. The Matthiesons arrived early in the evening, and immediately at Morgan's request, Matthieson handed him Mrs. Matthieson's deed. Thereupon Morgan passed the deed to the lady, telling her that he had that afternoon given Mrs. McIntyre a deed to the home place, and added that he had been promising Mrs. Matthieson a present for twenty-five years and was now giving her a lot in Hollywood. Mrs. Matthieson, taking the deed, laid it on the mantel with her purse and gloves. Morgan then said that Mrs. McIntyre had agreed to let Matthieson hold her deed while he himself lived, and asked Mrs. Matthieson as a favor to him to let her husband hold her deed likewise, so that it would not be recorded during Morgan's lifetime. Mrs. Matthieson assented; and as they left, handed her deed to her husband.

According to the testimony, Morgan told both Mrs. McIntyre and Mrs. Matthieson that he might want to buy the properties back from them, in which case he would pay them certain amounts which he named.

Nothing more was done with the deeds until the day of Morgan's funeral, at which time Matthieson recorded the deeds made in favor of his wife and her sister, and also the deeds to the two grandchildren; and after the deeds had been recorded, he gave them to the respective grantees.

While such was the testimony at the trial, given by the witnesses for the defendant, Mrs. McIntyre's testimony was in conflict with that previously given by her in a deposition, wherein she admitted that she knew of the deposit agreement when it was being prepared, and that it had been handed to her at that time to look over. She said also, in reference to the return of her deed to Matthieson, that that was done because Morgan did not want anybody to interfere with the instructions he had given Matthieson, and that all the deeds were to be held under the same instructions.

Nothing was said in her deposition about her deed and Mrs. Matthieson's being "out from under the agreement." Likewise Matthieson's testimony was impeached by an affidavit made by him on September 22, 1925, before the suit was begun and when he was acting as special administrator of the Morgan estate. In that affidavit, after stating how the deeds were made and setting forth a copy of the deposit agreement, he declared that the four deeds were delivered to him by Morgan after being shown to Mrs. McIntyre and Mrs. Matthieson "for the purpose of apprising them of the existence of said deeds, it being the intention and desire of said decedent that said deeds be kept by affiant under the terms and conditions of said memorandum of agreement herein set forth." He declared also that the deeds remained continuously in his possession until recorded; and that no other or further instructions were ever given him, except that Morgan had said that he might want to recall them for financial reasons, and that if demand had been made by Morgan upon him, he would have surrendered the deeds to Morgan. This affidavit was made for use in connection with a return filed for the purpose of fixing the federal estate tax; and was made by Matthieson at the request of his co-executor Pollock, to whom Matthieson had previously made like verbal statements.

Further evidence casting doubt upon the testimony concerning delivery to the two women consisted of two letters written by Morgan in his own hand, and found in his safety deposit box after his death. One was written April 22, 1925, the very day after the alleged deliveries, the other on April 23d; and both were addressed to Morgan's administrator, or all whom it may concern. In those letters, idiocratically spelled, Morgan states in substance that on April 21st he deeded the home place to Mrs. McIntyre, but that she had "secured the transaction" through threats of bringing him into court in connection with his agreement to marry her, and that what he had done was to escape notoriety and rather than to have his "good name villified." And in the letter of April 23d he expressed a wish to have the administrators "help her to the amount of $1,000 to $1,500 dollars, but not the Home place." The letters were witnessed by Morgan's secretary, to whom he said that they

were important documents and would mean a great deal after his death.

These letters, calculated indeed to "cause doubt" in the mind of the depositary, are significant aids to the interpretation of the peculiar language of the deposit agreement; and when read with that agreement necessarily cast discredit on the testimony of the parties interested in the deeds.

While Mrs. Matthieson's testimony was not directly impeached, as was that of her husband and her sister, yet the alleged delivery of the deed to her was so concatenated with that of the deed to Mrs. McIntyre as to put both, as Matthieson is reported by one of plaintiff's witnesses to have said, in the same basket. The letters help also to point the meaning of certain remarks of Morgan during his last illness. To his daughter, Mrs. Pollock, and her husband, one of the executors, who were sitting at his bedside on an occasion when Matthieson and Mrs. McIntyre left the room together, Morgan said, according to Pollock's testimony, "Watch them, they will steal everything you have got; there is an important paper, find it; it means thirty thousand dollars to the estate."

The trial court found, among other things, that the deed to Mrs. Matthieson had been delivered to her husband by Morgan with instructions to hold it for Morgan during his life, but subject to surrender upon his demand, and in no event to record the deed until after Morgan's death; that it was not Morgan's intention to divest himself of title or to vest a present title in Mrs. Matthieson; that there never had been a delivery of the deed to Mrs. Matthieson and that the property formed part of the Morgan estate. The court accordingly held the executors entitled to have the deed canceled and possession of the property surrendered to the estate.

There is no attempt on the part of Mrs. Matthieson to found investiture of title in herself upon the deposit of the deeds with her husband under the agreement of April 20th. It is conceded that Morgan's retention of control defeated transmission of title. (9 Cal. Jur., pp. 163 and 171.)

The defendant does insist, however, that there was a personal delivery to her by Morgan, whereby her deed was removed from the operation of the agreement, and she acquired absolute title on the evening of April 21st. That

issue involved a disputed question of fact which it was the function of the trial judge to determine from the facts and circumstances in evidence. It was for him to pass upon the credibility of the witnesses, to weigh their testimony, and draw therefrom his inferences. (*Hotaling* v. *Hotaling*, 193 Cal. 368, 382 [56 A. L. R. 734, 224 Pac. 455]; *Duffy* v. *Duffy*, 71 Cal. App. 251, 258 [235 Pac. 62].)

In all such cases evidence as to the delivery of a deed, not recorded until after the chief actor's death, must necessarily be closely scrutinized; and the law demands that such a deed shall have in its support evidence clear, unequivocal and convincing, such as satisfies the court of actual intent to pass immediate title. It is manifest from the written decision of the trial court that the judge did not find the evidence in behalf of the defendant to be of a convincing character, and concluded that the preponderance of the evidence was in favor of plaintiffs. Though Mrs. Matthieson was not directly impeached, yet the judge was not bound to give implicit faith to her testimony. He was justified in testing its verity by the conduct of the parties, the distinctive characteristics of the transaction and all the attendant circumstances. (*Davis* v. *Judson*, 159 Cal. 121, 128 [113 Pac. 147]; *Blanc* v. *Connor*, 167 Cal. 719, 722, 723 [141 Pac. 217]; *Caldwell* v. *Wiener*, 203 Cal. 543, 546 [264 Pac. 1110].)

Our statement of the evidence, as gathered from the record, exhibits abundant justification for the decision rendered, and the finding of the trial court is conclusive on this appeal.

The defendant complains of the admission of evidence concerning Mrs. McIntyre's deed and the precautions taken in relation to it by Morgan. In the admission of that testimony the court did not err. The deeds were made as parts of one scheme. And in respect of the alleged personal deliveries, one in the afternoon, the other in the evening, of April 21st, Mrs. Matthieson's deed was so linked to her sister's as to make the circumstances surrounding both occurrences proper evidentiary matter as an aid in arriving at the intent and real meaning of the transaction. (*Williams* v. *Kidd*, 170 Cal. 631, 645 [Ann. Cas. 1916E, 703, 151 Pac. 1]; *Cox* v. *Schnerr*, 172 Cal. 371, 380 [156 Pac. 509].)

The letters and subsequent declarations of Morgan were also admissible, not to disparage the deed, but to give light on the question whether in any of his dealings about the deeds Morgan's intent was to divest himself of title. (*Williams* v. *Kidd,* 170 Cal. 631, 648, 649 [Ann. Cas. 1916E, 703, 151 Pac. 1] ; *Fisher* v. *Oliver,* 174 Cal. 781, 788 [164 Pac. 800].)

In cases of this character the truth cannot always be elicited by focusing the evidence sharply on the precise point in dispute. There are often sidelights of revealing power; and reasonable freedom must be accorded in judging the relevancy of evidence and sifting the facts. We are satisfied that no undue latitude was permitted in this instance.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 28, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 27, 1930.

All the Justices concurred.