[Civ. No. 20444.    First Dist., Div. One.    Jan. 15, 1963.]

J. F. BLACKBURN, Plaintiff and Respondent, v. HARRIET M. DRAKE et al., Defendants and Appellants.

Johnson & Harmon for Defendants and Appellants.

Brown, Kellogg & Taber for Plaintiff and Respondent.

MOLINARI, J.—This is an appeal from a judgment quieting title in the respondent to certain real property in Oakland, California.

## Question Presented

In this action to quiet title brought by a surviving husband against his three stepdaughters, the sole question on appeal is whether there is sufficient evidence to support the trial court's finding that a deed executed by the deceased wife was not delivered to the said stepdaughters.

## The Record

The respondent, J. F. Blackburn, is the surviving husband of Josephine Blackburn. Beatrice Giesser, and appellants, Mary Hughes and Harriet Drake, are Mrs. Blackburn's daughters by a previous marriage. During their marriage the Blackburns acquired premises at 3877 Shafter Avenue, Oakland, by a joint tenancy deed. They resided on said premises until Mrs. Blackburn's death on June 5, 1957. During the period that the Blackburns resided together on said premises, Mr. Blackburn paid the taxes, insurance and the costs of repairs and improvements thereon from his earnings. Mrs. Blackburn participated in making repairs and improvements on the house by the performance of manual work.

In 1955, Mrs. Blackburn executed a deed, bearing date of January 21, 1955, purporting to convey her interest in said property to her three daughters. Mrs. Giesser, a defendant in the action below but not a party to this appeal, testified concerning the circumstances surrounding the execution of the deed as follows: that she and Mrs. Blackburn went to the real estate office of a Mrs. Gibb; that Mrs. Blackburn entered said office while she (Mrs. Giesser) parked the car; that she did not know who prepared the deed; that when she entered the office after parking her car the deed had already been prepared; that she didn't recall seeing it before it was signed or notarized; that Mrs. Blackburn signed the deed in question in her presence; that at said time Mrs. Blackburn said to Mrs. Giesser, " 'Well, here it is. You can put me out now, if you want to. Take it and record it' "; that the deed was then handed to her by Mrs. Gibb, "the notary," whereupon she and her mother left the said office. At another stage of her testimony, Mrs. Giesser described this statement of her mother at Mrs. Gibb's office as follows: "Oh, she just kiddingly said, 'There it is. You can put me out now, if you want to,' and I kind of laughed and said,

'Well, it has been done.'" Mrs. Giesser testified further that she kept the deed at her home and did not record it until after her mother's death, explaining that, because Mr. and Mrs. Blackburn were having domestic difficulties and were on the verge of a divorce she kept "putting off having it recorded," feeling that if she recorded the deed she "might precipitate more trouble between them. . . ." Mrs. Giesser also testified that from the date of the execution of the deed by her mother until the date of her mother's death she did not exercise any claim of ownership to the property in question in any manner.

In January or February of 1957 Mr. Blackburn was involved in an automobile accident. Mrs. Blackburn thereupon filed a declaration of homestead on the property without discussing it with Mr. Blackburn and without his knowledge. The said homestead recited, among other things, that it was made for the joint benefit of herself and her husband.

Mr. Blackburn testified that he did not learn of the execution of this deed or of the homestead until after his wife's death. He also testified that there was no change in the manner in which he and Mrs. Blackburn conducted themselves toward this property after June 21, 1955, the date on which the deed in question was purportedly executed.

It was stipulated between counsel at the trial that if Mrs. Gibb were called as a witness she would testify that Mrs. Blackburn and Mrs. Giesser appeared before her on January 21, 1955, and that she did, on that date, notarize the deed in question and then handed it to Mrs. Giesser.

Mrs. Hughes, one of the appellants, testified that following the funeral she stated to the respondent "that Mama had left her half of the property to us and that my two sisters and myself had discussed it before . . . and that we had all decided that Pa should have the place to live in as long as he would live. . . ." Mr. Blackburn continued to live on said premises after his wife's death and still does. Mrs. Hughes also stated that her mother had told her "that there was much trouble between she and Pa and that she didn't feel like leaving her half of the property to him in view of the fact that apparently their marriage was so far on the rocks that he couldn't say a civil word to her anymore"; that Mrs. Blackburn felt she should leave the property to her and her sisters; and that "she was going to make a deed to us." There was also testimony adduced from Mrs. Giesser with respect to the deed that she and her mother had explained

to an attorney that Mrs. Blackburn "wanted to leave her part to us and we wanted to know if it could be done that way."

Mrs. Giesser caused the deed in question to be recorded on June 7, 1957, two days after Mrs. Blackburn's death. Thereafter, Mrs. Giesser quitclaimed her interest in the subject property in exchange for a quitclaim by the respondent of his interest in another parcel. The respondent brought the instant action to quiet title to the property naming as the defendants the three daughters, individually, and Mrs. Giesser, as administratrix of the decedent's estate. Mrs. Giesser answered and disclaimed any interest in the property either on her own behalf or on behalf of the estate. The two other defendants each claimed a one-sixth interest in the property and cross-complained to have such title quieted in them. The trial court held for the respondent, finding that there had been no delivery of the deed to the grantees and that the deed did not convey any interest in the property.

### Did The Trial Court Err In Finding That The Deed Was Not Delivered

Delivery or absence of delivery is a question of fact to be determined by the trial court. (*Condencia* v. *Nelson,* 187 Cal.App.2d 300, 302 [9 Cal.Rptr. 759]; *Chaffee* v. *Sorensen,* 107 Cal.App.2d 284, 288 [236 P.2d 851].) Intent to pass title is an essential element of delivery and the question of intent is a question of fact to be determined by the trial court or jury upon all the circumstances surrounding the transaction. (*Jones* v. *Jones,* 183 Cal.App.2d 468, 472 [6 Cal.Rptr. 819]; *Williams* v. *Kidd,* 170 Cal. 631, 638 [151 P. 1, Ann.Cas. 1916 E 703]; *Priest* v. *Bell,* 123 Cal.App.2d 528, 531 [267 P.2d 49]; *Donahue* v. *Sweeney,* 171 Cal. 388 [153 P. 708].) The important intention is that of the grantor and not that of the grantee. (*Huth* v. *Katz,* 30 Cal.2d 605, 608 [184 P.2d 521]; 15 Cal.Jur.2d § 84, p. 481.) A deed delivered with the intent that it shall take effect only on the death of the grantor is an attempted testamentary disposition and therefore void. (*Williams* v. *Kidd, supra,* 170 Cal. 631, 644.) The applicable rule is well-stated in *Henneberry* v. *Henneberry,* 164 Cal.App.2d 125 [330 P.2d 250]: "In addition to physical delivery, and an acceptance by the grantee, to constitute a valid delivery there must exist a mutual intention on the part of the parties, and particularly on the part of the grantor, to pass title to the property immediately. In other words, to be a valid delivery,

the instrument must be meant by the grantor to be presently operative as a deed, that is, there must be the intent on the part of the grantor to divest himself presently of the title. ▪ Even if the document is manually delivered, but the evidence shows that the parties or the grantor intended the document to become operative only upon death, the document is testamentary in character and void as a deed.'' (P. 129.)

The appellants contend that there is a presumption that a deed in the possession of the grantee has been delivered; that this presumption is present in the instant case; and that it has not been rebutted. They rely upon *Stewart* v. *Silva,* 192 Cal. 405 [221 P. 191], wherein it was held that possession of a deed by the grantee constituted prima facie evidence of delivery. There is some confusion among the authorities, however, as to whether possession of a deed raises a presumption or an inference. (See *Estate of Galvin,* 114 Cal.App.2d 354, 360-362 [250 P.2d 333].) A number of cases have held in favor of the existence of the presumption. (*Stewart* v. *Silva, supra,* 192 Cal. 405; *Belli* v. *Bonavia,* 167 Cal.App.2d 275 [334 P.2d 196]; *California Trust Co.* v. *Hughes,* 111 Cal. App.2d 717 [245 P.2d 374]; *Hill* v. *Donnelly,* 43 Cal.App.2d 47 [110 P.2d 135]; *Thompson* v. *McKenna,* 22 Cal.App. 129 [133 P. 512]; *Central Trust Co.* v. *Stoddard,* 4 Cal.App. 647 [88 P. 806].) Others have held that such possession merely raises an inference of delivery. (See *Miller* v. *Jansen,* 21 Cal.2d 473, 477 [132 P.2d 801], and 13 cases there cited; see also *Hennelly* v. *Bank of America,* 102 Cal.App.2d 754 [228 P.2d 79]; *Jones* v. *Jones, supra,* 183 Cal.App.2d 468.) The confusion apparently stems from the interpretation of section 1055 of the Civil Code which provides that ''A grant duly executed is presumed to have been delivered at its date.'' ▪ In *Miller* v. *Jansen, supra,* it was held that the presumption created by this section pertains only to the date, not to the fact of delivery; and that a duly signed *and delivered* instrument is presumed to have been delivered at its date. Stated another way, the interpretation of *Miller* is that once delivery in fact is established a presumption attaches that the deed was delivered on the date it bears. ▪ As to the fact of delivery, says *Miller,* possession by the grantee gives rise to an *inference* that the instrument was duly delivered. It would appear, therefore, that *Miller* has finally settled the confusion by deciding that possession raises an inference rather than a presumption. (See *Estate of Galvin, supra,* pp. 360-361; *Jones* v. *Jones, supra.*) ▪ We

thus have in the law of our state a statutory presumption as to the date of delivery of an instrument, and a nonstatutory inference as to the fact of delivery of the instrument where it is in the possession of the grantee. Whatever the niceties of the law be as between a presumption and an inference insofar as the kind or amount of evidence necessary to dispel such presumption or inference, it is settled law that the inference of delivery and the presumption of date of delivery are rebuttable and in the face of contrary evidence become considerations of fact for the trial court or jury to determine. (*Jones* v. *Jones, supra,* 183 Cal.App.2d 468; *Hennelly* v. *Bank of America, supra,* 102 Cal.App.2d 754, 758; *Estate of Galvin, supra,* 114 Cal.App.2d 354.)

As to the fact of delivery, the appellants contend that there is no evidence dispelling the presumption claimed by them. The precise question at hand is whether there are circumstances or other contradicting evidence which dispel the inference of delivery. The respondent is not concerned with the effect of the inference of delivery, or the claimed presumption of delivery, but is content to rest his argument on the assertion that the evidence in support of the trial court's findings was overwhelming and convincing, and that any one of eight items of evidence alluded to would support the court's finding of nondelivery. We do not agree with the respondent that the evidence adduced by the respondent in sustaining his burden of proof as plaintiff, and its effect as evidence dispelling the inference of delivery, was overwhelming; nor are we in accord that each of the items of claimed evidence supports the lower court's findings. Upon a consideration of the entire record we are satisfied, however, that there is sufficient evidence to sustain the trial court's finding of nondelivery, and we shall hereafter allude to the evidentiary items, the cumulative effect of which establishes such sufficiency. Whether there was a delivery involved a disputed question of fact which was the function of the trial judge to determine from the facts and circumstances in evidence, it being within his province to pass upon the credibility of the witnesses, to weigh their testimony, and draw therefrom his inferences.

The appellants lay considerable stress upon the fact that the testimony of Mrs. Giesser as to the delivery of the deed is uncontradicted and that because of that fact and the claimed presumption which follows from her possession of the

deed, the trial court was not warranted in disregarding her testimony. To begin with there was merely an inference of delivery which was to be weighed with all other evidence in the case. In his memorandum opinion the trial judge stated that he "was not impressed by the testimony of Mrs. Giesser that there was an actual delivery of the deed. . . ." ▮▮ A trial court is not bound to accept an interested party's testimony as true, even though it is not contradicted, particularly where there are other circumstances which constitute a contradiction. (*Estate of Galvin, supra,* 114 Cal.App.2d 354, 363.) In *Lohman* v. *Lohman,* 29 Cal.2d 144, 149 [173 P.2d 657], the court said: "Moreover, a trial judge is not required to accept as true the sworn testimony of a witness, even in the absence of evidence directly contradicting it. . . ." In passing upon Mrs. Giesser's credibility, the court was authorized to consider her interest in the case. And while at the time of trial she no longer had any interest in the particular property because she had quitclaimed it in favor of the respondent, the fact that she did so in exchange for a quitclaim deed from the respondent to her as to another parcel of property, was a circumstance for the trial court's consideration of her interest in the case. Although Mrs. Giesser may not have been directly impeached, yet the judge was not bound to give implicit faith to her testimony. (*Estate of Galvin, supra,* 114 Cal.App.2d 354, 363; *Morgan* v. *Matthieson,* 103 Cal.App. 510, 517 [285 P. 325].)

From the evidence before us, the trial court could find that Mrs. Blackburn did not intend that the deed should be presently operative. This inference could be drawn from Mrs. Giesser's testimony that her mother "*just kiddingly* said, 'There it is. You can put me out now, if you want to' . . . ." (Emphasis added.) Appellants' assertion that Mrs. Blackburn was not "kidding" when she told her daughter to record the deed creates, at best, a conflict in the evidence. ▮▮ While it is true that recordation is not essential to the validity of a deed and that the failure to record in and of itself does not vitiate delivery or the intent to make a present transfer (*Belli* v. *Bonavia, supra,* 167 Cal.App.2d 275, 280; *Stewart* v. *Silva, supra,* 192 Cal. 405, 410), the failure to record until after the death of the grantor is a circumstance for the court to consider with the other circumstances surrounding the transaction in ascertaining whether the grantor intended the deed to be presently operative. (*Estate of Galvin, supra,* p. 363; *Priest* v. *Bell, supra,* 123 Cal.App.2d 528, 531.)

The decedent's statements that she "didn't feel like leaving her half of the property" to her husband; that "she felt that she ought to leave it" to her daughters; that "she wanted to leave her part to us"; and that "she was going to make a deed to us," were such as to support the conclusion drawn by the trial court, namely, that Mrs. Blackburn did not intend to part with the title but merely intended the deed as a testamentary disposition to take effect upon her death. The appellants cite Webster's Collegiate Dictionary in support of their assertion that the word "leave" has many meanings, including "to give up, relinquish" and "To put, place, deposit, deliver, or the like, so as to allow to remain." The respondent, in turn, cites the first listed definition of "leave" in Webster's International Dictionary, to wit: "to allow or cause to remain; to cause to remain, or be followed by, after passing away or cessation; to have remaining at death; hence, to bequeath or devise; . . ." In *Estate of Nelson,* 132 Cal. 182 [64 P. 294], we find this applicable statement with reference to the meaning of words, to wit: "Philology is, at best, an unsafe criterion for ascertaining the meaning of words which are in common use, and the definition thus obtained is always subordinate to the meaning derived from the context, or from the circumstances under which the word is used." (P. 191.) In the instant case we cannot say, as a matter of law, that the trial court was not warranted, under the circumstances, in interpreting the words used as suggestive of a gift at death by way of testamentary disposition.

The appellants assert that even if the grantor intended to "leave" the property to her daughters, the effect is to immediately pass a fee simple, subject to a reserved life estate. Three cases are cited in support of this contention, to wit: *Osborn* v. *Osborn,* 42 Cal.2d 358 [267 P.2d 333]; *Bury* v. *Young,* 98 Cal. 446 [31 P. 338, 35 Am.St.Rep. 186], and *Belli* v. *Bonavia, supra,* 167 Cal.App.2d 275. None of these cases support the appellants' proposition. To the contrary, they support the rule that delivery is a question of intent. *Osborn* and *Bury* hold that the deposit of a deed granting an estate in fee simple with a third party and with instructions that it be transmitted to the grantee upon the death of the grantor, conveys a remainder interest in fee simple with a life estate reserved in the grantor, *if the grantor intended the deposit to be irrevocable.* In each of these cases the deed was delivered to a third party with such instructions. It was

there held that under the facts and circumstances an intention was evinced by the grantor to make valid delivery of the deed vesting title immediately in the grantees subject to a life tenancy in the grantor. In the instant case we not only have the question of whether there was a valid delivery, but we have a purported delivery to the grantees directly without an intermediate third party acting under instructions to transmit the fee to the grantee upon the death of the grantor.

In the present case if there were a valid delivery it was made to the grantees themselves, and while purportedly made to Mrs. Giesser, it was a delivery to all of the sisters because delivery to one joint owner is delivery to the others. (*Belli* v. *Bonavia, supra,* 167 Cal.App.2d 275, 280.)

Moreover, it should be here pointed out that if a valid delivery was made to Mrs. Giesser, acceptance on the part of the appellants would be presumed even though they had no knowledge of the deed because the grant is beneficial to them. (*Belli* v. *Bonavia, supra,* p. 280; *Estate of Kalt,* 16 Cal.2d 807, 813 [108 P.2d 401, 133 A.L.R. 1424].) The *Belli* case is not in point because a valid delivery was found to have been made directly to the grantee.

We next consider the course of conduct wherein the decedent, after the execution of the deed and the alleged delivery thereof, continued to live on the premises, permitted her husband to pay all of the taxes from community property (his earnings) and to use the same funds to pay for insurance and various maintenance costs. Appellants assert that similar conduct was held not to overcome the "presumption" of delivery in other decided cases, namely, *Stewart* v. *Silva, supra,* 192 Cal. 405, and *Belli* v. *Bonavia, supra,* 167 Cal.App. 2d 275. In *Stewart,* the grantor executed the deed in compliance with a promise made by his godchild that she would come to live with him and that she would work for him during the rest of his life. There was uncontradicted testimony that the grantor, as he handed the deed in question to the grantee, said: " 'This is the deed of your property that I give you. From now on this property is yours, but during the time I live I will receive all the interest and I shall pay the taxes and then after I die send this paper to the recorder. . . .' " (P. 407.) The grantee retained the deed until the grantor's death at which time she recorded it. There was other testimony by third persons as to statements made by the grantor evidencing a present intention to transfer title. The trial court found that the deed was not delivered. In

reversing the lower court, the Supreme Court held that under the facts of the case, and as a matter of law, the presumption of delivery was not overcome. As we have pointed out above, the *Stewart* case, which has tacitly been overruled by *Miller* (the *Miller* case did not mention or cite *Stewart*) held that possession of a deed by the grantee raised a presumption of delivery. *Stewart* holds further that a prima facie case is made by such possession and that " 'nothing but the most satisfactory evidence of nondelivery should prevail against the presumption.' " (P. 409.) Consonant with this rule the court held that under the circumstances the grantor's continued residence with the grantee on the property, his exercise of acts of ownership over the property during his lifetime, and the recording of the deed upon his death, were not sufficient to overcome the prima facie case. The rationale of the holding in *Stewart* is that these circumstances would not prevent the delivery from becoming effective "if the grantor in fact *intended* to deliver the deed." (P. 410; emphasis added.) *Stewart* recognized that the intention of the grantor to make a present transfer of title is the paramount consideration. In arriving at its holding, under the rule announced by it, the Supreme Court evaluated the circumstances narrated above against the presumption and found them wanting. Under the present state of our decisional law, however, the exercise of acts of ownership or dominion by the grantor, as well as the absence of such acts on the part of the grantee, are evidentiary circumstances which are weighed by the trier of fact against the *inference* of delivery.

As pointed out in *Estate of Galvin*, the acts of control by the grantor do not vitiate the title of the grantee *where there has been a delivery*, nor are they shown for the purpose of vitiating the deed. "They were circumstances which if standing alone might not evidence nondelivery, but which added to all the other circumstances in the case strongly show that there was no delivery." (P. 363.) Belli, which held there *was* a delivery under the facts of the case, reiterated the rule that the "[p]ayment of taxes and keeping up insurance by the grantor are consistent with the intent to pass title." (P. 280). *Belli* does not hold that such circumstances may not be considered in determining whether or not the grantor intended to pass title immediately. While *Belli* follows *Stewart* in holding that possession of the deed by the grantee raises a presumption of delivery, the essence of its

holding is that the payment of taxes and insurance by the grantor and the other circumstances presented did not prevail against the presumption.

Exercise of dominion over property after the execution of a deed is incompatible with delivery and inconsistent with divestiture of title. (*Condencia* v. *Nelson, supra,* 187 Cal.App.2d 300, 303; *Owens* v. *Ring,* 117 Cal.App.2d 672, 677 [256 P.2d 1040].) While such dominion does not negate delivery as a matter of law, its incompatibility with delivery renders it a circumstance to be considered by the trier of fact on the question of delivery or nondelivery, particularly when coupled, as here, with the circumstance of nonexercise of dominion by the grantees. Another circumstance of dominion for the trial court's consideration in the instant case is the declaration of homestead by Mrs. Blackburn after the execution of the deed in question. Under section 1238, Civil Code, a married female may select a homestead from community property, the separate property of her husband or from that held by the spouses as tenants in common or in joint tenancy. (*Squibb* v. *Squibb,* 190 Cal.App.2d 766, 768 [12 Cal.Rptr. 346].) In the instant case there was no finding that the property in question was the community property of the parties. In the absence of such a finding, the interests of the husband and wife in said property are separate because the property having been conveyed to them as joint tenants, the form of the conveyance destroyed the statutory presumption that it was community property. (*Mears* v. *Mears,* 180 Cal.App.2d 484, 500 [4 Cal.Rptr. 618].) If, then, there was a valid delivery of the deed in question, Mrs. Blackburn would thus have conveyed her separate one-half interest to her daughters, the other half remaining in her husband. The effect of the declaration of homestead would then have amounted to a declaration of homestead on the one-half interest owned by her husband and the one-half interest of her daughters. A wife may make a declaration of homestead on the separate property of her husband, with or without his knowledge, and even over his objection. (Civ. Code, § 1238; *Warner* v. *Warner,* 144 Cal. 615 [78 P. 24]; *Morrison* v. *Barham,* 184 Cal.App.2d 267 [7 Cal.Rptr. 442].)

It has also been decided in this state that a homestead in no wise depends upon the character of the title which the homestead claimant has, and that mere naked possession, without other title, may be impressed with the homestead characteristic. In such a case, the character of the title im-

pressed is of no concern to the creditor and the homestead right may be maintained against all the world but the owner of the superior title. (*Bell* v. *Wilson*, 172 Cal. 123, 126-127 [155 P. 625]; *Spencer* v. *Geissman*, 37 Cal. 96 [99 Am.Dec. 248]; *In re Rauer's Collection Co.*, 87 Cal.App.2d 248, 261 [196 P.2d 803].) The rationale of the last cited cases is that the homestead right is not an estate in the land but a mere privilege of exemption from execution of such estate as the holder occupies. It appears, therefore, since Mrs. Blackburn was in possession of the instant property at the time of the declaration of homestead, that she could declare a homestead on property which was owned one-half by her husband and one-half by her daughters. (See *Estate of Kachigian*, 20 Cal. 2d 787, 789 [128 P.2d 865].) ▆▆▆ Such declaration would not, however, affect the rights of the cotenants because a homestead claimant acquires only such rights of occupancy as he had before the creation of the homestead. The cotenant, in such case, may sell or assign his undivided share or seek partition. (*Squibb* v. *Squibb*, *supra*, 190 Cal.App.2d 766, 769; *Estate of Kachigian*, *supra*, 20 Cal.2d 787.)

The trial court stated in its memorandum opinion that in view of sections 1238, 1242, and 1265 of the Civil Code, applying to homesteads, "it must be presumed that when the decedent executed and recorded the homestead on March 7, 1957, that she believed that she had some freehold title, interest or estate in the property with the right of possession even though such possession was not exclusive; further, that in the execution and recording of such homestead the decedent exercised an act of proprietorship by her which is evidence of ownership and lack of delivery. . . ." In view of the foregoing principles applicable to homesteads the trial court was not warranted in indulging in such a presumption. Moreover, the opinion of the trial judge may not be used to impeach, modify or add to his findings because the findings supersede such opinion. (*Gantner* v. *Gantner*, 39 Cal.2d 272 [246 P.2d 923]; *Strudthoff* v. *Yates*, 28 Cal.2d 602 [170 P.2d 873].) Such opinion may, however, be considered for the purpose of discovering the process by which he arrived at his conclusion, and as an aid in interpreting his findings where interpretation is necessary. (*1st Olympic Corp.* v. *Hawryluk*, 185 Cal.App.2d 832, 838 [8 Cal.Rptr. 728].) The trial court found that the homestead was executed by Mrs. Blackburn without the knowledge of Mr. Blackburn of its existence until

after his wife's death. This finding is based on facts which are not in dispute. No other reference to the homestead is made in the findings. There is, however, a finding that Mr. and Mrs. Blackburn "continued to occupy said real property as their family home until the death of said Josephine Blackburn, both of them during all of said time exercising all of the dominion and rights of ownership as fee simple owners thereof." Another finding recited that from the time the joint tenancy deed in question was executed and until Mrs. Blackburn's death, Mr. and Mrs. Blackburn "continued to reside on said property together and they occupied the same as their home, improved it with their mutual efforts and community earnings, paid all taxes and assessments on it from their community earnings, and exercised all of the rights of ownership without any of the three daughters, the purported Grantees in said Deed, exercising or claiming any right of ownership in said property."

The declaration of homestead by Mrs. Blackburn would not in and of itself negative the fact of delivery. The trial court was, however, justified in considering it (no objection having been interposed to its admission) as another circumstance touching on the question as to whether Mrs. Blackburn intended the deed to be operative at death. As such it was relevant to the issue as to whether Mrs. Blackburn was exercising acts of dominion or proprietorship in said property. The question whether, under all of the circumstances, Mrs. Blackburn was declaring a homestead upon property in which she had a mere right of naked possession or whether she intended to impress a homestead on property which she owned in fee simple was for the trial court's determination. Here, while the circumstance of the homestead declaration was such as to support the conclusion, had the trial court made it, that Mrs. Blackburn intended to declare a homestead on property in which she merely had a right of possession in order to save her husband's one-half interest from his creditors, such a conclusion is not compelled. The court could likewise draw the conclusion that by such declaration she intended to protect the joint interest of herself and her husband in property the title to which was still in joint tenancy. This latter conclusion would be another evidentiary circumstance tending to support the sufficiency of the trial court's findings as to the exercise of the rights of dominion and ownership.

In view of the trial court's duty of weighing the value and

effect of the testimony of the parties whom it saw and heard and of the other evidence adduced before it, we are satisfied that there are present here sufficient evidentiary circumstances, which, when added together, warrant the trial court's conclusion that the deed in question was not delivered.

Judgment affirmed.

Bray, P. J., and Sullivan, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 13, 1963.